FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

2014 MAY 30  PM 3:23

TIMOTHY M. O'BRIEN
CLERK
BY_____DEPUTY
KANSAS CITY, KS

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| THE UNITED STATES OF AMERICA )<br>ex rel. Megen Duffy )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>LAWRENCE MEMORIAL HOSPITAL )<br>)<br>)<br>Defendant )<br>)<br>_____ ) | CIVIL ACTION CASE NO. 14-CV-2256<br>SAC / KGS<br><br>*FILED IN CAMERA*<br>*and UNDER SEAL*<br><br>**FALSE CLAIMS ACT COMPLAINT** |

## INTRODUCTORY STATEMENT

The Plaintiff, MEGEN DUFFY, by and through her counsel of record, brings this action on behalf of the United States of America against LAWRENCE MEMORIAL HOSPITAL (hereinafter "Defendant") pursuant to the Qui Tam provisions of the Federal False Claims Act, 31 U.S.C. §§3729-33 ("Federal FCA" or "FCA"),(referred to herein as "Qui Tam Action"). Pursuant to 31 U.S.C. §3730(b)(2), this action is brought in camera and under seal.

Plaintiff alleges that Defendant has violated the Federal FCA, by submitting or causing to be submitted false claims for reimbursement from Medicaid and from Medicare, and by making false certifications upon which payments from the federal government were based.

## JURISDICTION AND VENUE

1

1. This Court has jurisdiction over this action under the Federal FCA pursuant to 28 U.S.C. §§1331 and 1345, and 31 U.S.C. §§3732(a) and 3730.

2. Venue is appropriate as the Defendant can be found in, resides in, and/or transacts business in this judicial district. Therefore, within the meaning of 28 U.S.C. §1391(b) and (c) and 31 U.S.C. §3732(a), venue is proper.

3. To Relator's knowledge, jurisdiction over this action is not barred by 31 U.S.C. §3730(e): there is no civil suit or administrative proceeding involving the allegations and transactions herein to which the United States is a party; there has been no "public disclosure" of these allegations or transactions; and Relator is the "original source" of the information on which these allegations are based.

## THE PARTIES

4. Plaintiff Megan Duffy is a citizen of the United States of America and a resident of Kansas. From August 2009 until October 31, 2013, Plaintiff was employed by Defendant as an Emergency Department nurse. Plaintiff brings this action based upon direct and unique information obtained during the period of her employment with Defendant in this capacity. As characterized by the Federal False Claims Act, Plaintiff will often be referred to as "Relator" hereafter. Ms. Duffy has provided some of this information to the United States and will provide additional information through a Relator's "Disclosure Statement" to be served on the United States.

5. Defendant Lawrence Memorial Hospital is a municipal hospital located in Lawrence, Kansas, and is a Kansas Medicaid (KMAP) Provider. Defendant contracts with Medicaid, Medicare, and other government budgets and private insurance to provide healthcare services to patients.

2

6. At all relevant times herein Defendant has operated as a hospital and healthcare provider in Lawrence, Kansas.

## THE FEDERAL-STATE MEDICAID PROGRAM

7. The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §1396-1396v (hereinafter "Medicaid"), is a Health Insurance Program administered by the Government of the United States and the various individual States (and territories) and is funded by State and Federal taxpayer revenue. In Kansas, Medicaid funding remained roughly 40% state-funded and 60% federally-funded throughout the relevant time periods herein. The Medicaid Program is overseen by the United States Department of Health and Human Services through the Centers for Medicare and Medicaid Services (hereinafter "CMS"). Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needing individuals who qualify for Medicaid.

## THE DEFICIT REDUCTION ACT OF 2005

8. Section 6032 of the Federal Deficit Reduction Act of 2005, signed into law in February 2006, and codified at 42 U.S.C. §1396(a)(68) requires that, as of January 1, 2007, all healthcare providers who receive $5 million or more annually from Medicaid, as a condition of receiving Medicaid payments: shall (A) establish written policies for all employees of the entity (including management), and of any contractor or agent of the entity, that provide detailed information about the False Claims Act established under sections 3729 through 3733 of title 31, administrative remedies for false claims and statements established under chapter 38 of title 31, any State laws pertaining to civil or criminal penalties for false claims and statements, and

3

whistleblower protections under such laws, with respect to the role of such laws in preventing and detecting fraud, waste, and abuse in Federal healthcare programs (as defined in section 1320a 7b(f) of this title); (B) include as part of such written policies detailed provisions regarding the entity's policies and procedures for detecting and preventing fraud, waste, and abuse; and (C) include in any employee handbook for the entity, a specific discussion of the laws described in subparagraph (A), the rights of employees to be protected as whistleblowers, and the entity's policies and procedures for detecting and preventing fraud, waste, and abuse.

9. As a Kansas Medicaid (KMAP) Provider, Defendant is required each year since 2007 to sign and submit the following "Attestation of Compliance with Section 6032 of the Federal Deficit Reduction Act":

10. "I hereby attest that, as a condition for receiving payments, I have read Section 6032 of the Deficit Reduction Act of 2005 (the Act), and have examined the above-named provider/entity's policies and procedures. Based on that review the provider/entity is in compliance with the requirements of the Act **to educate employees** and contractors concerning the Federal False Claims Act established under sections 3729 through 3733 of Title 31, United States Code, administrative remedies for false claims and statements established under Chapter 38 of Title 31, United States Code, State laws pertaining to Medicaid fraud, abuse, civil or criminal penalties for false claims and statements, and whistleblower protections under such laws, with respect to the role of such laws in preventing and detecting fraud, waste and abuse in Federal healthcare programs. Furthermore, **the provider/entity will continue to comply with these provisions to remain eligible for payment under the Kansas Medical Assistance Program**. I understand that if any statements in this declaration are false, they may be subject to prosecution under the Kansas perjury law, K.S.A. 21-3805, as well as the laws cited in this

declaration. I declare under penalty of perjury under the laws of the state of Kansas that the foregoing is true and correct." (Emphasis added).

11.     This attestation is then signed and dated, as a condition of receiving Medicaid funds, by the entity's Chief Executive Officer, President or Vice President.

12.     Compliance with these requirements is mandatory. Any provider or provider entity that fails to comply with the annual attestation or the submission of information will be subject to sanction, including suspension of Medicaid payments or termination from participation in the Kansas Medical Assistance (Medicaid) Program.

13.     The Centers for Medicare and Medicaid Services (hereinafter "CMS") extended the deadline for compliance with this requirement of the Deficit Reduction Act from January 2007 to March 2007. Because this compliance was statutorily made a "condition of receiving such [Medicaid] payments," the receipt of Medicaid payments by any such healthcare provider after March of 2007 required certification of compliance with this requirement of the Deficit Reduction Act. And any false certifications of such compliance made in order to receive Medicaid payments would constitute false records or statements material to a false or fraudulent claim, in order to get a false or fraudulent claim paid or approved by Medicaid, which would be a violation of the federal False Claims Act.

## THE FEDERAL MEDICARE PROGRAM

13.     The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §1395-1395ccc, (hereinafter "Medicare"), is a Health Insurance Program administered by the Government of the United States and is funded solely by Federal taxpayer revenue. The Medicare Program is overseen by the United States Department of Health and Human Services

5

through the Centers for Medicare and Medicaid Services (CMS). Medicare provides funding for healthcare services and supplies for individuals age 65 and older, those with end stage renal failure, and for individuals with certain permanent disabilities. Medicare Part B provides funding for hospital care for all such individuals.

## THE AFFORDABLE CARE ACT AND CMS' HOSPITAL VALUE-BASED PURCHASING PROGRAM

14. The Affordable Care Act of 2010, in an effort to shift away from the fee-for-service model that rewarded providers for quantity of care, established the Hospital Value-Based Purchasing Program ("HVBP" or "Hospital VBP"), which affects payment for roughly 2,985 hospitals across the country. Under the HVBP, Medicare makes incentive payments to hospitals based on either 1) How well they have and continue to perform on each tracked measure, or 2) How much they improve their performance on each measure compared to their performance during a baseline period.

15. The HVBP reduced payments to hospitals and placed the savings of more than $800 million per year into a fund which then goes to rewarding hospitals based on how well they meet these performance measures, standards and goals.

16. Some standards and goals apply hospital-wide such as the "Patient Experience of Care Domain" which measures performance in eight areas. These areas are 1) Nurse Communication, 2) Doctor Communication, 3) Hospital Staff Responsiveness, 4) Pain Management, 5) Medicine Communication, 6) Hospital Cleanliness and Quietness, 7) Discharge Information, and 8) Overall Hospital Rating. But because patients, unlike hospitals, do not employ a staff of people to guide them on CMS reporting procedures and protocol, not every

patient experience gets reported to CMS, and many of those that do rely on the integrity of the hospital to ensure that they are properly and honestly reported, or even reported at all.

17. Other standards and goals are more specific to particular areas of a hospital. For example, Surgical Departments are given standards on how soon after surgery a urinary catheter is to be removed, how long after surgery prophylactic antibiotics are to be discontinued, etc.

18. Similarly, hospital Emergency Departments are given standards for measurement that include 1) door-to-EKG times, 2) decision to admit times, 3) treatment of pneumonia, 4) treatment of sepsis, 5) discharge after a cardiac event, etc.

19. After the Affordable Care Act was enacted in 2010, the measure for door-to-EKG times was ten minutes or less in order for a hospital to show top performance and to qualify for maximum reimbursement from this $800 million fund that was being established. By the Fall of 2010 CMS had revised the number down to three minutes or less.

## FEDERAL AND STATE FALSE CLAIMS ACTS

20. The Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A) makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment, a violation of federal law.

21. The Federal FCA, 31 U.S.C. §3729(a)(1)(B) makes "knowingly" making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, in order to get a false or fraudulent claim paid or approved by the Government, a violation of federal law.

22. The Federal FCA, 31 U.S.C. §3729(a)(1)(D) makes having possession, custody, or control of property or money used, or to be used, by the Government and knowingly

delivering, or causing to be delivered, less than that amount of money or property, a violation of federal law.

23. The Federal FCA, 31 U.S.C. §3729(a)(1)(C) makes conspiring to commit any of the above acts under the Federal False Claims Act, a violation of federal law.

24. The Federal FCA defines "knowing" as that a person, with respect to information, 1) has actual knowledge of the information, 2) acts in deliberate ignorance of the truth or falsity of the information, or 3) acts in reckless disregard of the truth or falsity of the information, and requires no specific intent to defraud.

25. The Federal FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property, whether or not the United States has title to the money or property, which is presented to an officer, employee or agent of the United States; or which is made to a contractor, grantee, or other recipient (including a state or local governmental agency), if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, *and if the United States Government provides or has provided any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.* (Emphasis added.)

## FACTS AND ALLEGATIONS

26. Relator began working for Defendant in or about August 2009. Relator's job title was Registered Nurse, and she worked in Defendant's Emergency Department.

27. In the years that followed during Relator's employment with Defendant she became certified in TNCC, ENPC and ACLS and became board-certified in emergency nursing.

Relator received multiple accolades and positive performance reviews, with no negative reviews until her abrupt termination.

28. On a typical day during Relator's employment, Defendant's Emergency Department treated many patients with complaints of "chest pain." At that time, it was standard practice to properly and accurately record both the arrival times of patients and the times when EKGs were obtained, as with any other presenting patient and complaint.

29. After enactment of the Affordable Care Act, reimbursement rules changed.

30. In 2010 the Emergency Department Staff members received their first training from their Department Educator, Elaine Swisher, regarding new policies that would require the staff to falsely report patient arrival times by delaying their registration to appear as though this time coincided with the time those chest pain patients received an EKG.

31. This was to be done in order to make it appear that those patients were immediately receiving an EKG upon arrival, with the stated intent from supervisors and administrators that it would allow the hospital to maximize their reimbursement under the new Value-Based Payment reimbursement rules and rates.

32. Beginning about this same time, employees were threatened with disciplinary activity if they failed to follow this directive in falsely reporting these arrival times, and the Staff received training at monthly Staff meetings on how to falsely record and report these times.

33. In one such Staff meeting, one of Relator's associates, Jeanine McCullough, RN, asked how the hospital could ethically discipline employees for not committing fraud as directed. No answer was given.

34. If a patient presented to triage with a complaint of chest pain, the triage tech was to notify the triage RN immediately.

35. The triage RN was to decide whether the "chest pain" was likely to be cardiac. If it was, then the patient was not to be registered, but was to instead wait as an unregistered patient for an EKG.

36. After an EKG was obtained, ER registration was notified and then proceeded to register the patient.

37. RN training and chart reviews, which were included in yearly personnel reviews, included ensuring that the triage time matched the EKG time in the computer.

38. In or about January 2013, Relator attended a lecture delivered by Karen Schumate, Defendant's Chief Operations Officer, in which Ms. Schumate discussed Meaningful Use and Medicare reimbursement in depth.

39. Closely following this lecture by Ms. Schumate was an Emergency Department Staff meeting in which the then-Director of the Emergency Department, Joan Harvey, made it very clear that failure to fall into the top tiers nationwide would reduce the hospital's reimbursement. Therefore, employees would be held to stricter standards regarding the points over which the Emergency Department had control, most notably zero EKG times and extremely short admission times from the time of the decision to admit.

40. Relator asked again what these repercussions would be and stated that she felt uncomfortable falsifying times, and Ms. Harvey stated that there were plenty of other hospitals where Relator could work.

41. In addition to ethical dilemmas regarding falsifying the data with the explicit goal of defrauding Medicare, these "zero EKG times" ironically resulted in delays in patient care.

42. This is because when patients were not immediately registered, in order to have later registration times to coincide with EKG times, they were treated as though they were not in

the Emergency Department at all, and physicians could not order treatment for them during that time as a result.

43. An email from then-Director of Defendant's Emergency Department, Joan Harvey, in 2011 reads, "The ED physicians have expressed concern with trading 'zero' minute EKGs for a delay in the QTR [Quick Triage Registration] for them to enter orders on the cardiac patients. When it is necessary due to patient acuity, pull an admissions person in ASAP on those patients to get them into the system."

44. In other words, the physicians were fully aware that they were trading patient care for favorable reimbursement data and were concerned about the human consequences of doing so.

45. In 2013, Defendant experimented with various ways of falsifying the times patients waited to transfer out of the ER after the decision to admit was made.

46. Relator was terminated on October 31, 2013, but the last she knew, the process was for the unit secretaries in the Emergency Department to wait until the hospitalist had seen the patient and had written orders before entering the decision to admit ("starting the clock").

47. Relator expressed concern with this as well, because a patient could lie in the Emergency Department for 5 hours after being told she would be admitted, but if the hospitalist was busy and waited up to 5 hours to write orders, it would still appear in the records that the time from decision to admit to transfer was very fast.

48. The goal, for maximum reimbursement, from the time of the decision to admit to the actual admission was 30 minutes or less.

49. As stated above, Defendant terminated Relator's employment on October 31, 2013. Ryan Jackson, who replaced Joan Harvey as the Director of the Emergency Department in

July 2013, along with Carolyn Bowmer, Vice President of Human Resources, and Dana Hale, Vice President of Nursing, were present during Relator's termination.

50. The fabricated reason given at that time for Relator's termination was that Relator had sent a threatening text to another employee, and these supervisors claimed that "people are so afraid of you they have been on administrative leave," and that a "thorough investigation" had been conducted.

51. This claim seemed suspicious from the outset as Relator knew of no such text, nor did she know of any employee or person she had placed in fear, and Relator's attendance at work throughout October had been very limited because of a life-threatening cardiac condition that necessitated surgery that month.

52. Relator asked during her termination whom she had allegedly threatened and asked to see the threatening text she had allegedly sent.

53. Relator pointed out that a thorough investigation should include asking her, as the accused, about the alleged threats. Those present refused to provide the name or show Relator the supposed text.

54. It remains unknown how or why anyone would be afraid or need to take leave given that Relator was a sick cardiac patient at the time who was on medical leave most of the month of October. And relator was terminated almost literally when she walked back in the door to work after recovering from her surgery.

55. After Relator's termination, and after she was able to determine how and where to report the fraudulent activity of Defendant, Relator contacted CMS in November 2013.

56. CMS then referred the case for investigation to a 3rd party contractor, NCI AdvanceMed, which is now investigating the claims.

57. In February 2014, Relator returned to Defendant's Emergency Department as a patient and witnessed that the same fraudulent practices of falsifying arrival times of "chest pain" patients to create the illusion of zero "door-to-EKG times" was still continuing.

58. Defendant is a Kansas Medicaid Provider of healthcare services.

59. On information and belief, Defendant received more than $5 million annually from Medicaid from Calendar Year 2007 through 2014.

60. While several Staff meetings were held by Defendant to instruct Staff members on how to commit fraud against the government and falsify records, and Staff members were instructed on the consequences of what would happen if they failed to comply with these directives, no comparable efforts, nor any efforts at all, were made to inform employees about the Federal False Claims Act or any of the provisions related thereto as required by Section 6032 of the Deficit Reduction Act.

61. At no time during more than four years of employment with Defendant was Relator ever made aware by Defendant of any established or written policies that provide detailed information, or any information at all, about the False Claims Act established under sections 3729 through 3733 of Title 31, administrative remedies for false claims and statements established under chapter 38 of Title 31, any State laws pertaining to civil or criminal penalties for false claims and statements, and whistleblower protections under such laws, with respect to the role of such laws in preventing and detecting fraud, waste, and abuse in Federal healthcare programs as defined under 42 U.S.C. §1320a, as required by Federal law for all healthcare providers receiving more than $5 million annually from Medicaid.

62. At no time during more than four years of employment with Defendant was Relator ever made aware by Defendant of any programs, policies or procedures of Defendant for

13

detecting and preventing fraud, waste and abuse, as required by Federal law for all healthcare providers receiving more than $5 million annually from Medicaid.

63. Other employees of Defendant were also never made aware by Defendant of the Federal and State False Claims Acts, administrative remedies, whistleblower protections under such laws, or the policies or procedures of the Defendant for detecting and preventing fraud, waste and abuse, despite the requirements of the Deficit Reduction Act of 2005 that every employee of Defendant receive such information from Defendant as a condition of Defendant receiving Medicaid payments.

64. It was the specific lack of any such information or training that left Relator searching for months to know how and to whom to report the suspected fraud she had been witnessing as an employee of Defendant Lawrence Memorial Hospital.

65. Eventually Relator learned on her own and through her own research how and to whom to report suspected fraud, which she did in November 2013, the month after her employment was terminated by Defendant.

66. Based upon the foregoing facts, all Medicaid payments received by Defendant after March 2007 through at least 2014 were based upon false material statements made by Defendant in order to get false claims paid by Medicaid in violation of the Federal False Claims Act in 31 U.S.C. §3729 et seq., and of the Deficit Reduction Act of 2005 as codified in 42 U.S.C. §1396(a)(68).

67. During the course of Relator's employment, in the absence of training or information about the False Claims Act, whistleblower protections and rights, or policies for detecting fraud, waste and abuse, what the Relator and her coworkers did receive training on was

14

how to game the system with false information to maximize reimbursement rates from CMS, and what would happen to them if they failed to follow these directives.

## COUNT I

## VIOLATIONS OF THE FEDERAL FCA: 31 U.S.C. §3729(a)(1)(A), (B) and (C)

68. Relator restates and realleges the allegations contained in Paragraphs 1 through 67 above as if each was stated herein in its entirety and said allegations are incorporated herein by reference.

69. The False Claims Act, 31 U.S.C. §3729(a)(1), prohibits persons from (A) knowingly presenting, or causing to be presented to the United States Government, false claims for payment, or (B) knowingly making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government, or (C) conspiring to commit a violation of subparagraph (A) or (B) identified above.

70. The Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim by falsely attesting and certifying compliance with the requirements of Section 6032 of the Deficit Reduction Act as contained in 42 U.S.C. §1396a(a)(68), in order to receive, and to continue to receive, Medicaid funds, despite Defendant's non-compliance with specific requirements of the law upon which receiving Medicaid payments were conditioned, which caused false or fraudulent claims for payment to be presented for approval.

71. The Defendant also knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(B), by falsely recording and reporting "door-to-EKG" times and falsely reporting the actual wait times between the "decision to admit" and actual admission, both in regard to numerous patients on a daily basis over a prolonged period of time, with the specific intent to defraud the government with knowingly false reimbursement data which made Defendant appear it was in the top tier of hospitals and eligible for maximum reimbursement under the Hospital Value-Based Purchasing rules created by the Affordable Care Act. This caused false or fraudulent claims to be presented for approval at a higher reimbursement rate than Defendant was eligible to receive, in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(A).

72. These were intentional billing fraud schemes designed and directed by administration and supervisors in a conspiracy to commit violations, and cause others to commit violations, of the False Claims Act in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(C).

73. The Defendant directed, participated in, or authorized others to take the actions set forth above, on behalf of Defendant, over a period of years, with some violations beginning as early as 2007, and others in 2010, and continuing until at least the present time in 2014.

74. The United States has been damaged as a result of Defendant's violations of the False Claims Act because it paid for certain overpayments and ineligible payments totaling millions of dollars.

75. As set for in the preceding paragraphs, Defendant has knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. §3729(a)(1)(A), (B) and

(C), and has thereby damaged the United States Government by these actions in a specific amount to be determined at trial.

WHEREFORE, Relator Megen Duffy, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendant under the Federal FCA Counts as follows:

(a) In favor of the United States against the Defendant for treble the amount of damages to Medicaid and to Medicare from the false claims submitted, plus maximum civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

(b) In favor of the United States against the Defendant for disgorgement of the profits earned by Defendant as a result of its unlawful conduct.

(c) In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. §3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d) For all costs of the Federal FCA civil action

(e) In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable.

Respectfully submitted,

/s/ Robert K. Collins
Robert K. Collins, #22675
Collins Law Office, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collinslegal.com

/s/ Theodore J. Lickteig
Theodore J. Lickteig, #12977
Law Offices of Theodore J. Lickteig

17

12760 West 87th Street, Suite 112
Lenexa, Kansas 66215-2878
(913) 894-1090
tjllawoffice@planetkc.com

*Attorneys for Plaintiff/Relator*

## DEMAND FOR A JURY TRIAL

Plaintiff/Relator respectfully requests that the issues in this matter be heard by a jury.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff/Relator hereby designates the Federal Court in Kansas City, Kansas as the place of trial in this matter.

/s/ Robert K. Collins
Robert K. Collins, #22675
Collins Law Office, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collinslegal.com

/s/ Theodore J. Lickteig
Theodore J. Lickteig, #12977
Law Offices of Theodore J. Lickteig
12760 West 87th Street, Suite 112
Lenexa, Kansas 66215-2878
(913) 894-1090
tjllawoffice@planetkc.com

18