## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA )
ex rel. Megen Duffy )
                          )     **CIVIL ACTION**
        **Plaintiffs,** )     **CASE NO.** <u>2:14-cv-02256-SAG-KGS</u>
                          )
                          )
**v.** )     *FILED IN CAMERA*
                          )     *and UNDER SEAL*
**LAWRENCE MEMORIAL HOSPITAL** )
                          )
                          )     **FALSE CLAIMS ACT COMPLAINT**
        **Defendant** )
                          )
_____ )

### AMENDED COMPLAINT

### INTRODUCTORY STATEMENT

       The Plaintiff, MEGEN DUFFY, by and through her counsel of record, brings this action

on behalf of the United States of America against LAWRENCE MEMORIAL HOSPITAL

(hereinafter "Defendant") pursuant to the Qui Tam provisions of the Federal False Claims Act,

31 U.S.C. §§3729-33 ("Federal FCA" or "FCA"),(referred to herein as "Qui Tam Action").

Pursuant to 31 U.S.C. §3730(b)(2), this action is brought in camera and under seal.

       Plaintiff alleges that Defendant has violated the Federal FCA, by submitting or causing to

be submitted false claims for reimbursement from Medicaid and from Medicare, and by making

false certifications upon which payments from the federal government were based.

1

The fraud scheme utilized by Defendant included, but was not limited to, submitting knowingly false performance reports to the Centers for Medicare and Medicaid Services. These included knowingly false IQR (quality of care reports) reports required to be made under the Medicare Modernization Act of 2003 and the Hospital Value-Based Purchasing Program established under the Affordable Care Act of 2010.  Provisions under these Acts, and under the relevant section of the Deficit Reduction Act of 2005 required these reports to be true and accurate, and provided increased annual payments from Medicare when these reports were submitted with true and accurate information.  But by submitting knowingly false reports, Defendant was not entitled to these increased annual payments from Medicare because the reports were not true or accurate.

The Federal False Claims Act makes it a false claims act violation to submit a knowingly false claim for payment, or to make or to cause to be made a false statement upon which a claim for payment by the government is based.

Additionally, Defendant falsified records to make it appear Defendant was meeting better performance standards than Defendant actually was. These false records were then submitted to the Centers for Medicare and Medicaid Services and used to obtain higher incentive payments than Defendant was actually entitled to under the Hospital Value-Based Purchasing Program.

This started by falsifying patient "arrival times" in the Emergency Department to appear to coincide exactly with the time of the automatically documented time produced by the EKG monitor.  All subsequent quality measures under the Hospital Value-Based Purchasing Program also then became false when based upon this falsified "arrival time."

For example, door-to-ekg times measure the time from the arrival of a patient with chest pains in the Emergency Department to the time that patient receives an EKG.  Having a door-to-

ekg time of less than 3 minutes places a hospital in the top 5% of hospitals nationally and improves a hospital's incentive payments under the Hospital Value-Based Purchasing Program.

Similarly, the time within which a patient presenting with a blood clot must receive blood thinning medication is identified as "door-to-needle" time and must be less than 30 minutes from the time of the patient's arrival in the Emergency Department in order to remain in the top tier and receive the maximum incentive payments under the Hospital Value-Based Purchasing Program.

And, the time within which a patient presenting with chest pains who is determined to need an angioplasty procedure must receive that procedure is identified as "door-to-balloon" time, and it must occur in less than 90 minutes from the time of the patient's arrival in the Emergency Department in order for the hospital to remain in the top tier of hospitals and to receive the maximum incentive payments under the Hospital Value-Based Purchasing Program.

By knowingly and intentionally creating false "arrival times" in patient records, the Defendant was then enabled, if needed, to take up to 135 minutes from the actual arrival time to the time of an angioplasty procedure and report it instead as having been performed in less than 90 minutes from the time of the patient's arrival in the emergency room, in order to receive the maximum incentive payment under the Hospital Value-Based Purchasing Program.

And the Defendant could, for example, then do the same with door-to-needle-times, door-to-ekg times, etc., so long as the arrival time in the Emergency Department was falsified as Defendant directed Relator and the rest of the Emergency Department staff to do.

This process of creating intentionally fraudulent and false "arrival times" resulted in fraudulent door-to-ekg times, door-to-balloon times, etc. and the submission of false claims for payments to be made by the government to the Defendant.

Finally, Defendant violated the Federal FCA by falsely certifying to State and Federal Medicaid officials in writing that Defendant was in full compliance with the false claims act training and education requirements of the Deficit Reduction Act of 2005, which made full compliance with this requirement a condition of receiving any Medicaid payment after March 2007.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action under the Federal FCA pursuant to 28 U.S.C. §§1331 and 1345, and 31 U.S.C. §§3732(a) and 3730.

2.      Venue is appropriate as the Defendant can be found in, resides in, and/or transacts business in this judicial district. Therefore, within the meaning of 28 U.S.C. §1391(b) and (c) and 31 U.S.C. §3732(a), venue is proper.

3.      To Relator's knowledge, jurisdiction over this action is not barred by 31 U.S.C. §3730(e): there is no civil suit or administrative proceeding involving the allegations and transactions herein to which the United States is a party; there has been no "public disclosure" of these allegations or transactions; and Relator is the "original source" of the information on which these allegations are based.

## THE PARTIES

4.      Plaintiff Megen Duffy is a citizen of the United States of America and a resident of Kansas. From August 2009 until October 31, 2013, Plaintiff was employed by Defendant as an Emergency Department nurse. Plaintiff brings this action based upon direct and unique information obtained during the period of her employment with Defendant in this capacity. As characterized by the Federal False Claims Act, Plaintiff will often be referred to as "Relator"

hereafter. Ms. Duffy has provided some of this information to the United States and will provide additional information through a Relator's "Disclosure Statement" to be served on the United States.

5.      Defendant Lawrence Memorial Hospital is a municipal hospital located in Lawrence, Kansas, and is a Kansas Medicaid (KMAP) Provider, and also is recognized by the Centers for Medicare and Medicaid Services as an Acute Care Hospital. Defendant contracts with Medicaid, Medicare, and other taxpayer funded healthcare plans and private insurance to provide healthcare services to patients.

6.      At all relevant times herein Defendant has operated as a hospital and healthcare provider in Lawrence, Kansas.

## THE FEDERAL-STATE MEDICAID PROGRAM

7.      The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §1396-1396v (hereinafter "Medicaid"), is a Health Insurance Program administered by the Government of the United States and the various individual States (and territories) and is funded by State and Federal taxpayer revenue. In Kansas, Medicaid funding remained roughly 40% state-funded and 60% federally-funded throughout the relevant time periods herein. The Medicaid Program is overseen by the United States Department of Health and Human Services through the Centers for Medicare and Medicaid Services (hereinafter "CMS"). Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needing individuals who qualify for Medicaid.

## THE DEFICIT REDUCTION ACT OF 2005

8.      Section 6032 of the Federal Deficit Reduction Act of 2005, signed into law in February 2006, and codified at 42 U.S.C. §1396(a)(68) requires that, as of January 1, 2007, all healthcare providers who receive $5 million or more annually from Medicaid, as a condition of receiving Medicaid payments: shall (A) establish written policies for all employees of the entity (including management), and of any contractor or agent of the entity, that provide detailed information about the False Claims Act established under sections 3729 through 3733 of title 31, administrative remedies for false claims and statements established under chapter 38 of title 31, any State laws pertaining to civil or criminal penalties for false claims and statements, and whistleblower protections under such laws, with respect to the role of such laws in preventing and detecting fraud, waste, and abuse in Federal healthcare programs (as defined in section 1320a 7b(f) of this title); (B) include as part of such written policies detailed provisions regarding the entity's policies and procedures for detecting and preventing fraud, waste, and abuse; and (C) include in any employee handbook for the entity, a specific discussion of the laws described in subparagraph (A), the rights of employees to be protected as whistleblowers, and the entity's policies and procedures for detecting and preventing fraud, waste, and abuse.

9.      As a Kansas Medicaid (KMAP) Provider, Defendant is required each year since 2007 to sign and submit the following "Attestation of Compliance with Section 6032 of the Federal Deficit Reduction Act":

10.      "I hereby attest that, as a condition for receiving payments, I have read Section 6032 of the Deficit Reduction Act of 2005 (the Act), and have examined the above-named provider/entity's policies and procedures. Based on that review the provider/entity is in compliance with the requirements of the Act **to educate employees** and contractors concerning the Federal False Claims Act established under sections 3729 through 3733 of Title 31, United

States Code, administrative remedies for false claims and statements established under Chapter 38 of Title 31, United States Code, State laws pertaining to Medicaid fraud, abuse, civil or criminal penalties for false claims and statements, and whistleblower protections under such laws, with respect to the role of such laws in preventing and detecting fraud, waste and abuse in Federal healthcare programs. Furthermore, **the provider/entity will continue to comply with these provisions to remain eligible for payment under the Kansas Medical Assistance Program**. I understand that if any statements in this declaration are false, they may be subject to prosecution under the Kansas perjury law, K.S.A. 21-3805, as well as the laws cited in this declaration. I declare under penalty of perjury under the laws of the state of Kansas that the foregoing is true and correct." (Emphasis added).

11.     This attestation is then signed and dated, as a condition of receiving Medicaid funds, by the entity's Chief Executive Officer, President or Vice President.

12.     Compliance with these requirements is mandatory. Any provider or provider entity that fails to comply with the annual attestation or the submission of information will be subject to sanction, including suspension of Medicaid payments or termination from participation in the Kansas Medical Assistance (Medicaid) Program.

13.     The Centers for Medicare and Medicaid Services (hereinafter "CMS") extended the deadline for compliance with this requirement of the Deficit Reduction Act from January 2007 to March 2007.  Because this compliance was statutorily made a "condition of receiving such [Medicaid] payments," the receipt of Medicaid payments by any such healthcare provider after March of 2007 required certification of compliance with this requirement of the Deficit Reduction Act. And any false certifications of such compliance made in order to receive Medicaid payments would constitute false records or statements material to a false or fraudulent

claim, in order to get a false or fraudulent claim paid or approved by Medicaid, which would be a violation of the federal False Claims Act.

## THE FEDERAL MEDICARE PROGRAM

14.     The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §1395-1395ccc, (hereinafter "Medicare"), is a Health Insurance Program administered by the Government of the United States and is funded solely by Federal taxpayer revenue.  The Medicare Program is overseen by the United States Department of Health and Human Services through the Centers for Medicare and Medicaid Services (CMS). Medicare provides funding for healthcare services and supplies for individuals age 65 and older, those with end stage renal failure, and for individuals with certain permanent disabilities.  Medicare Part B provides funding for hospital care for all such individuals.

## THE MEDICARE MODERNIZATION ACT OF 2003
## HOSPITAL INPATIENT QUALITY REPORTING PROGRAM ("IQR")

15.     Section 501(b) of the Medicare Prescription Drug Improvement and Modernization Act of 2003, Public Law 108-173, and Section 5001(a) of the Deficit Reduction Act of 2005, Public Law 109-171, provide incentives to encourage hospitals to report to CMS data about inpatient care. (*See Social Security Act Section 1886(b)(3)(B)(vii) and (viii).*) The Inpatient Quality Reporting ("IQR") program does not provide for evaluation of the hospital's quality of inpatient treatment. This law merely establishes a requirement for the hospital to report accurate information to CMS. The reward for accurate reporting is a higher annual update to the standardized amount for hospital inpatient operating costs (sometimes called the market basket

update). However, a hospital is penalized with a reduction in its annual Medicare payment rates when it fails to meet reporting requirements.

16.    The hospitals are required to report data on specific quality measures of patient care as set out by CMS. For its initial quality for IQR reporting, CMS chose information concerning four topics: Acute Myocardial Infarction (AMI), Heart Failure (HF), Pneumonia (PN), and Surgical Care Improvement (SCIP).  *See 42 CFR Parts 422 & 480, 76 Federal Register 26492 (May 6, 2011).*

17.    CMS will ultimately expand the quality measures required for reporting, but initially targeted these areas because they involve "(a) conditions that result in the greatest mortality and morbidity in the Medicare population, (b) conditions that are high volume and high cost for Medicare, and (c) conditions for which wide cost and treatment variations have been reported, despite established clinical guidelines." *See 42 CFR Parts 422 & 480, 76 Federal Register 26496 (May 6, 2011).*

18.    For purposes of IQR, CMS initially adopted the standards for health care quality measurement development by the National Quality Forum ("NQF"). The standards set by NQF for AMI treatment require that a hospital perform an electrocardiogram ("EKG") of a possible AMI patient <u>within three minutes after the patient's arrival at the hospital</u> ("door-to-EKG" time), provide Fibrinolytic Therapy (administration of clot-busting medications) <u>within thirty minutes after the patient's arrival at the hospital</u> ("door-to-needle" time), and provide the Primary Percutaneous Coronary Intervention (PCI, a balloon angioplasty) <u>within ninety minutes of the patient's arrival at the hospital</u> ("door-to-balloon" time).

19.     Additionally, CMS publishes the Specifications Manual to set the national hospital quality measures for a given period and to assist hospitals in tracing and reporting requisite information.

20.     In the Dictionary portion of its Specifications Manual, CMS defines "Arrival Time" as "[t]he earliest documented time (military time) the patient arrived at the hospital." At pages 1-72 through 1-73.

21.     To determine arrival time, the hospital should carefully examine <u>all</u> medical record documentation from the acceptable sources recognized by CMS. These documents are: any emergency department documentation, nursing admission assessment/admitting note, observation record, procedure notes, and vital signs graphic record. Id at I-74. (emphasis added)

22.     The Emergency Department (ED) documentation specifically includes "ED vital sign record, ED/Outpatient Registration form, triage record and EKG reports, laboratory reports, x-ray reports, etc. if these services were rendered while the patient was an ED patient." CMS directs that "[a]rrival time should NOT be abstracted simply as the earliest time in the acceptable sources, without regard to other (i.e. ancillary services) substantiating documentation. If documentation suggests that the earliest time in the acceptable sources does not reflect the time the patient arrived at the hospital, this time should <u>not</u> be used." Id. at 1-73.  (emphasis added)

23.     In other words, a hospital is not allowed to simply rely on or report the EKG time as the determining measure of arrival time in isolation while ignoring all other acceptable sources recognized by CMS, including any emergency department documentation, registration record, nursing assessment/admitting note, observation record, procedure notes and vital sign records, or triage record.

24.     Because one or more of these "other acceptable sources" virtually always precedes the administration of an EKG for any patient presenting with chest pain in an Emergency Department, to simply report the EKG time as though it is every patient's "arrival time" is, therefore, both factually inaccurate and in violation of express CMS rules, guidelines and definitions.

25.     Falsely reporting the EKG time as a patient's arrival time would then violate requirements in federal law for hospitals to accurately report patient arrival times; "door-to-ekg" times; "door-to-needle" times; and "door-to-balloon" times, among the affected measures that are inaccurately reported, in violation of federal law, when patient arrival times are falsely reported as being the same as the patient's EKG time.

26.     And when Emergency Department staff is specifically and intentionally directed to have the triage nurse make "chest pain patients" which the nurse has determined to likely be "cardiac" then wait as unregistered patients for an EKG so that the "arrival time" can be recorded as the EKG time, this not only jeopardizes patient safety, it also constitutes knowingly manufacturing false and fraudulent records which were then used to get false claims paid by the government.

27.     Submitting knowingly false records to the government when those records are the basis upon which reimbursement or payment is to be made by the government constitutes a false claims act violation.


**THE AFFORDABLE CARE ACT AND CMS' HOSPITAL VALUE-BASED**

**PURCHASING PROGRAM**

28.     The Affordable Care Act of 2010, in an effort to shift away from the fee-for-service model that rewarded providers for quantity of care, established the Hospital Value-Based Purchasing Program ("HVBP" or "Hospital VBP"), which affects payment for roughly 2,985 hospitals across the country.  Under the HVBP, Medicare makes incentive payments to hospitals based on quality of care as measured by either 1) How well they have and continue to perform on each tracked measure, or 2) How much they improve their performance on each measure compared to their performance during a baseline period.

29.     Hospitals submit the same information for the HVBP program as they did for the IQR program described above. But now CMS "will reward hospitals based on actual quality performance on measures, rather than simply reporting data for those measures." *See 42 CFR Parts 422 and 480, 76 Federal Register 26490 (May 6, 2011).*

30.     Although the HVBP program began tracking hospital performance in 2010 (FY 2011), incentive payments were not available until 2012 (FY 2013). To determine incentives for fiscal year 2013, CMS looked to the information reported in 2011 as the base year and then compared it to the information reported in 2012. If the records reflected that the hospital performed well both years or showed improved performance in 2012 over 2011, the hospital was eligible for an incentive payment in fiscal year 2013.

31.     The HVBP reduced payments to hospitals and placed the savings of more than $800 million per year into a fund which then goes to rewarding hospitals based on how well they meet these performance measures, standards and goals. The HVPB Program also utilizes the standards for health quality measurement recognized in the IQR program.

32.     Some standards and goals for the HVBP Program apply hospital-wide such as the "Patient Experience of Care Domain" which measures performance in eight areas. These areas

are 1) Nurse Communication, 2) Doctor Communication, 3) Hospital Staff Responsiveness, 4) Pain Management, 5) Medicine Communication, 6) Hospital Cleanliness and Quietness, 7) Discharge Information, and 8) Overall Hospital Rating.  But because patients, unlike hospitals, do not employ a staff of people to guide them on CMS reporting procedures and protocol, not every patient experience gets reported to CMS, and many of those that do rely on the integrity of the hospital to ensure that they are properly and honestly reported, or even reported at all.

33.     Other standards and goals are more specific to particular areas of a hospital. For example, Surgical Departments are given standards on how soon after surgery a urinary catheter is to be removed, how long after surgery prophylactic antibiotics are to be discontinued, etc.

34.     Similarly, hospital Emergency Departments are given standards for measurement that include 1) door-to-EKG times, 2) door-to-needle times, 3) door-to-balloon times, 4) decision to admit times, 5) treatment of pneumonia, 6) treatment of sepsis, 7) discharge after a cardiac event, etc. Some of these are in the Specifications Manual and some are NQF standards, which CMS has adopted.

35.     After the Affordable Care Act was enacted in 2010, the measure for door-to-EKG times was ten minutes or less in order for a hospital to show top performance and to qualify for maximum reimbursement from this $800 million fund that was being established. Defendant stated to Relator and other employees via staff meetings and email that, as of the Fall of 2010, CMS had revised the number down to three minutes or less. These were NQF standards adopted by CMS.

36.     According to NQF, in 2014, the top 5th percentile of hospitals were reporting door-to-ekg times of 0-3 minutes. This determined the top tier of hospitals nationally. And the top tier of hospitals nationally receive the highest reimbursement under the HVBP Program.

## FEDERAL AND STATE FALSE CLAIMS ACTS

37.    The Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A) makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment, a violation of federal law.

38.    The Federal FCA, 31 U.S.C. §3729(a)(1)(B) makes "knowingly" making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, in order to get a false or fraudulent claim paid or approved by the Government, a violation of federal law.

39.    The Federal FCA, 31 U.S.C. §3729(a)(1)(D) makes having possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivering, or causing to be delivered, less than that amount of money or property, a violation of federal law.

40.    The Federal FCA, 31 U.S.C. §3729(a)(1)(C) makes conspiring to commit any of the above acts under the Federal False Claims Act, a violation of federal law.

41.    The Federal FCA defines "knowing" as that a person, with respect to information, 1) has actual knowledge of the information, 2) acts in deliberate ignorance of the truth or falsity of the information, or 3) acts in reckless disregard of the truth or falsity of the information, and requires no specific intent to defraud.

42.    The Federal FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property, whether or not the United States has title to the money or property, which is presented to an officer, employee or agent of the United States; or which is made to a contractor, grantee, or other recipient (including a state or local

governmental agency), if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, *and if the United States Government provides or has provided any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.* (Emphasis added.)

43.     The Kansas False Claims Act, K.S.A. 75-7501 et seq., closely mirrors the Federal FCA and makes the submission of false claims to state or local governments unlawful also under Kansas law. This act applies to the state portion of fraud losses caused by false claims to Medicaid or to any other jointly federal-state funded program, as well as false claims involving any other funds from the State of Kansas or any of its counties, cities, municipalities, townships or political subdivisions.

## FACTS AND ALLEGATIONS

44.     Relator began working for Defendant in or about August 2009. Relator's job title was Registered Nurse, and she worked in Defendant's Emergency Department.

45.     In the years that followed during Relator's employment with Defendant she became certified in TNCC, ENPC and ACLS and became board-certified in emergency nursing. Relator received multiple accolades and positive performance reviews, with no negative reviews until her abrupt termination.

46.     On a typical day during Relator's employment, Defendant's Emergency Department treated many patients with complaints of "chest pain." At that time, it was standard practice to properly and accurately record both the arrival times of patients and the times when EKGs were obtained, as with any other presenting patient and complaint.

47.     After enactment of the Affordable Care Act, reporting & reimbursement rules changed. Defendant, then, also changed its standard practices for Emergency Department documentation.

48.     In 2010 the Emergency Department Staff members received their first training from their Department Educator, Elaine Swisher, regarding new hospital policies that would require the staff to falsely report patient arrival times by delaying their registration to appear as though this time coincided with the time those chest pain patients received an electrocardiogram ("EKG").

49.     This was to be done in order to make it appear that those patients were immediately receiving an EKG upon arrival, with the stated intent from supervisors and administrators that it would allow the hospital to maximize their reimbursement rates or incentive payments under the new Value-Based Payment program.

50.     Additionally, once this "arrival time" was falsified, it bought the hospital time and allowed for the falsification of subsequent procedures for that patient in the hospital, including, but not limited to "door-to-balloon" times for patients who required angioplasty. Maximum incentive payments from HVBP required "door-to-balloon" times to be less than 90 minutes. And the falsified "arrival time" created in the Emergency Department under these directives allowed that goal to be reached more than if the actual arrival time had been documented in the patient's record and in the records submitted to CMS by Defendant upon which these HVBP incentive payments were based.

51.     Beginning about this same time, employees were threatened with disciplinary activity if they failed to follow this directive in falsely reporting these arrival times, and the Staff received training at monthly Staff meetings on how to falsely record and report these times.

52. In one such Staff meeting, one of Relator's associates, Jeanine McCullough, RN, asked how the hospital could ethically discipline employees for not committing fraud as directed. No answer was given.

53. If a patient presented to triage with a complaint of chest pain, the triage tech was to notify the triage RN immediately.

54. The triage RN was to decide whether the "chest pain" was likely to be cardiac. If it was, then the patient was not to be registered, but was to instead wait as an unregistered patient for an EKG.

55. After an EKG was obtained, ER registration was notified and then proceeded to register the patient. Through this procedure, the hospital ensured that the earliest recorded patient arrival time was the time on the automatically recorded EKG report rather than the time the patient actually arrived at the hospital.

56. Falsely recording the EKG time as the patient's "arrival time" then allowed the hospital to falsely report "door-to-ekg" times for patients, as well as "door-to-balloon" times, "door-to-needle" times, and any other measure that relied upon reported patient arrival times in determining reimbursement rates and incentive payments by the government to the hospital.

57. RN training and chart reviews, which were included in yearly personnel reviews, included ensuring that the triage time matched the EKG time in the computer.

58. In or about January 2013, Relator attended a lecture delivered by Karen Schumate, Defendant's Chief Operations Officer, in which Ms. Schumate discussed Meaningful Use and Medicare reimbursement in depth.

59. Closely following this lecture by Ms. Schumate was an Emergency Department Staff meeting in which the then-Director of the Emergency Department, Joan Harvey, made it

very clear that failure to fall into the top tiers nationwide would reduce the hospital's reimbursement, or incentive payments. Therefore, employees would be held to stricter standards regarding the points over which the Emergency Department had control, most notably "zero EKG times" and extremely short admission times from the time of the decision to admit.

60.     Relator asked again what these repercussions would be and stated that she felt uncomfortable falsifying times, and Ms. Harvey stated that there were plenty of other hospitals where Relator could work.

61.     In addition to ethical dilemmas regarding falsifying the data with the explicit goal of defrauding Medicare, these "zero EKG times" ironically resulted in delays in patient care.

62.     This is because when patients were not immediately registered, in order to have later registration times to coincide with EKG times, they were treated as though they were not in the Emergency Department at all, and physicians could not order treatment for them during that time as a result.

63.     In this way, the hospital attempted to rely solely on the time reflected on the EKG report to establish "Arrival Time" for purposes of the HVBP program. This was contrary to the requirement to consider all information regarding the time the patient arrived at the hospital.

64.     An email from then-Director of Defendant's Emergency Department, Joan Harvey, in 2011 reads, "The ED physicians have expressed concern with trading 'zero' minute EKGs for a delay in the QTR [Quick Triage Registration] for them to enter orders on the cardiac patients. When it is necessary due to patient acuity, pull an admissions person in ASAP on those patients to get them into the system."

65.     In other words, the physicians were fully aware that they were trading patient care for favorable reimbursement data and were concerned about the human consequences of doing so.

66.     In 2013, Defendant experimented with various ways of falsifying the times patients waited to transfer out of the ER after the decision to admit was made.

67.     Relator was terminated on October 31, 2013, but the last she knew, the process was for the unit secretaries in the Emergency Department to wait until the hospitalist had seen the patient and had written orders before entering the decision to admit ("starting the clock" on the 30 minute window of time to admit the patient in order to qualify for maximum reimbursement, or incentive payments).

68.     Relator expressed concern with this as well, because a patient could lie in the Emergency Department for 5 hours after being told she would be admitted, but if the hospitalist was busy and waited up to 5 hours to write orders, it would still appear in the records that the time from decision to admit to transfer was very fast.

69.     The goal, for maximum reimbursement and HVBP incentive payments, from the time of the decision to admit to the actual admission was 30 minutes or less.

70.     As stated above, Defendant terminated Relator's employment on October 31, 2013. Ryan Jackson, who replaced Joan Harvey as the Director of the Emergency Department in July 2013, along with Carolyn Bowmer, Vice President of Human Resources, and Dana Hale, Vice President of Nursing, were present during Relator's termination.

71.     The fabricated reason given at that time for Relator's termination was that Relator had sent a threatening text to another employee, and these supervisors claimed that "people are

so afraid of you they have been on administrative leave," and that a "thorough investigation" had been conducted.

72.     This claim seemed suspicious from the outset as Relator knew of no such text, nor did she know of any employee or person she had placed in fear, and Relator's attendance at work throughout October had been very limited because of a life-threatening cardiac condition that necessitated surgery that month.

73.     Relator asked during her termination whom she had allegedly threatened and asked to see the threatening text she had allegedly sent.

74.     Relator pointed out that a thorough investigation should include asking her, as the accused, about the alleged threats. Those present refused to provide the name or show Relator the supposed text.

75.     It remains unknown how or why anyone would be afraid or need to take leave given that Relator was a sick cardiac patient at the time who was on medical leave most of the month of October. And relator was terminated almost literally when she walked back in the door to work after recovering from her surgery.

76.     After Relator's termination, and after she was able to determine how and where to report the fraudulent activity of Defendant, Relator contacted CMS in November 2013.

77.     CMS then referred the case for investigation to a 3rd party contractor, NCI AdvanceMed, which is now investigating the claims.

78.     In February 2014, Relator returned to Defendant's Emergency Department as a patient and witnessed that the same fraudulent practices of falsifying arrival times of "chest pain" patients to create the illusion of zero "door-to-EKG times" was still continuing.

79.     Defendant is a Kansas Medicaid Provider of healthcare services.

80.     On information and belief, Defendant received more than $5 million annually from Medicaid from Calendar Year 2007 through 2014.

81.     While several Staff meetings were held by Defendant to instruct Staff members on how to commit fraud against the government and falsify records, and Staff members were instructed on the consequences of what would happen if they failed to comply with these directives, no comparable efforts, nor any efforts at all, were made to inform employees about the Federal False Claims Act or any of the provisions related thereto as required by Section 6032 of the Deficit Reduction Act.

82.     At no time during more than four years of employment with Defendant was Relator ever made aware by Defendant of any established or written policies that provide detailed information, or any information at all, about the False Claims Act established under sections 3729 through 3733 of Title 31, administrative remedies for false claims and statements established under chapter 38 of Title 31, any State laws pertaining to  civil or criminal penalties for false claims and statements, and whistleblower protections under such laws, with respect to the role of such laws in preventing and detecting fraud, waste, and abuse in Federal healthcare programs as defined under 42 U.S.C. §1320a, as required by Federal law for all healthcare providers receiving more than $5 million annually from Medicaid.

83.     At no time during more than four years of employment with Defendant was Relator ever made aware by Defendant of any programs, policies or procedures of Defendant for detecting and preventing fraud, waste and abuse, as required by Federal law for all healthcare providers receiving more than $5 million annually from Medicaid.

84.     Other employees of Defendant were also never made aware by Defendant of the Federal and State False Claims Acts, administrative remedies, whistleblower protections under

such laws, or the policies or procedures of the Defendant for detecting and preventing fraud, waste and abuse, despite the requirements of the Deficit Reduction Act of 2005 that every employee of Defendant receive such information from Defendant as a condition of Defendant receiving Medicaid payments.

85.     It was the specific lack of any such information or training that left Relator searching for months to know how and to whom to report the suspected fraud she had been witnessing as an employee of Defendant Lawrence Memorial Hospital.

86.     Eventually Relator learned on her own and through her own research how and to whom to report suspected fraud, which she did in November 2013, the month after her employment was terminated by Defendant.

87.     Based upon the foregoing facts, all Medicaid payments received by Defendant after March 2007 through at least 2014 were based upon false material statements made by Defendant in order to get false claims paid by Medicaid in violation of the Federal False Claims Act in 31 U.S.C. §3729 et seq., and of the Deficit Reduction Act of 2005 as codified in 42 U.S.C. §1396(a)(68).

88.     During the course of Relator's employment, in the absence of training or information about the False Claims Act, whistleblower protections and rights, or policies for detecting fraud, waste and abuse, what the Relator and her coworkers did receive training on was how to game the system with false information to maximize reimbursement rates from CMS, and what would happen to them if they failed to follow these directives.

89.     We cannot identify at this time all of the false claims caused by this Hospital because the Relator worked in only one department of a large, complex hospital. However, we have reason to believe, in addition to those false claims of which Relator does have personal

knowledge, that investigation of other departments in the Hospital will reveal further violations, specifically where "arrival times" and "decision-to-admit" times that Relator has reported being falsified were merely the first part of a quality measure then completed in other parts of the hospital, and upon which reimbursement or incentive payments under CMS programs were based.

## COUNT I

## VIOLATIONS OF THE FEDERAL FCA: 31 U.S.C. §3729(a)(1)(A), (B) and (C)

90.     Relator restates and realleges the allegations contained in Paragraphs 1 through 89 above as if each was stated herein in its entirety and said allegations are incorporated herein by reference.

91.     The False Claims Act, 31 U.S.C. §3729(a)(1), prohibits persons from (A) knowingly presenting, or causing to be presented to the United States Government, false claims for payment, or (B) knowingly making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government, or (C) conspiring to commit a violation of subparagraph (A) or (B) identified above.

92.     The False Claims Act, 31 U.S.C. 3729(b) defines "knowing" and "knowingly" as that a person, with respect to information, 1) has actual knowledge of the information; 2) acts in deliberate ignorance of the truth or falsity of the information; or 3) acts in deliberate ignorance of the truth or falsity of the information. And 31 U.S.C. 3729(b)(1)(B) makes clear that no proof of specific intent to defraud is required.

93.     The Defendant knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim by falsely attesting and certifying compliance with the requirements of Section 6032 of the Deficit Reduction Act as contained in 42 U.S.C. §1396(a)(68), in order to receive, and to continue to receive, Medicaid funds, despite Defendant's non-compliance with specific requirements of the law upon which receiving Medicaid payments were conditioned, which caused false or fraudulent claims for payment to be presented for approval.

94.     The Defendant also knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(B), by falsely recording and reporting IQR data which included several quality measures, including but not limited to, Emergency Department "arrival times," "door-to-EKG," times, "door-to-balloon" times, and falsely reporting the actual wait times between the "decision to admit" and actual admission, each in regard to numerous patients on a daily basis over a prolonged period of time.

95.     These IQR records, which Defendant submitted to CMS, were knowingly false.

96.     Annual increased Medicare payments under the Medicare Modernization Act of 2003 and the Deficit Reduction Act of 2005, separate even from the Affordable Care Act of 2010, were predicated upon these reported numbers being true and accurate.

97.     The act of knowingly reporting false data was done with the specific intent to defraud the government with knowingly false data which made Defendant appear that its reported information was true and accurate, in order to receive the annual Medicare percentage increase for reporting these numbers, even while laying the ground work for false claims

violations that would occur based upon these same reported numbers under the Hospital Value-Based Purchasing program.

98.     These knowingly false records and statements were made to get payments made by the government at higher percentages than Defendant was eligible to receive in annual payments from Medicare, in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(A).

99.     The Defendant also knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(B), by falsely recording and reporting these same Emergency Department "arrival times," "door-to-EKG," times, "door-to-balloon" times, and falsely reporting the actual wait times between the "decision to admit" and actual admission, each in regard to numerous patients on a daily basis over a prolonged period of time.

100.    This was done with the specific intent to defraud the government with knowingly false reimbursement data which made Defendant appear it was in the top tier of hospitals and eligible for maximum incentive payments under the Hospital Value-Based Purchasing rules created by the Affordable Care Act.

101.    This caused false or fraudulent claims to be presented for approval for larger incentive payments than Defendant was eligible to receive, in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(A).

102.    These were intentional billing fraud schemes designed and directed by Defendant's administration and supervisors in a conspiracy to commit violations, and cause others to commit violations, of the False Claims Act in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(C).

103.    Defendant has established procedures within its hospital which have resulted in a pattern and practice of submitting false records for the purpose of obtaining government funds to which it was not entitled. Defendant had actual knowledge of the falsity of these documents. By specifically instructing its staff to document current patient treatment and change records of prior treatment in a misleading manner, Defendant designed a system to submit false records.

104.    The Defendant directed, participated in, or authorized others to take the actions set forth above, on behalf of Defendant, over a period of years, with some violations beginning as early as 2007, and others in 2010, and continuing until at least the present time in 2014.

105.    The United States has been damaged as a result of Defendant's violations of the False Claims Act because it paid for certain overpayments and ineligible payments totaling millions of dollars.

106.    As set forth in the preceding paragraphs, Defendant has knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. §3729(a)(1)(A), (B) and (C), and has thereby damaged the United States Government by these actions in a specific amount to be determined at trial.

WHEREFORE, Relator Megen Duffy, acting on behalf of and in the name of the United States of America, demands and prays that judgment be entered as follows against Defendant under the Federal FCA Counts as follows:

(a)    In favor of the United States against the Defendant for treble the amount of damages to Medicaid and to Medicare from the false claims submitted, plus maximum civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

(b)    In favor of the United States against the Defendant for disgorgement of the profits earned by Defendant as a result of its unlawful conduct.

(c)  In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. §3730(d)

to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d)  For all costs of the Federal FCA civil action

(e)  In favor of the Relator and the United States for such other and further relief as this Court

deems to be just and equitable.


Respectfully submitted,

/s/ Robert K. Collins
Robert K. Collins, #22675
Collins Law Office, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collinslegal.com


/s/ Theodore J. Lickteig
Theodore J. Lickteig, #12977
Law Offices of Theodore J. Lickteig
12760 West 87th Street, Suite 112
Lenexa, Kansas 66215-2878
(913) 894-1090
tjllawoffice@planetkc.com

*Attorneys for Plaintiff/Relator*


## DEMAND FOR A JURY TRIAL

Plaintiff/Relator respectfully requests that the issues in this matter be heard by a jury.


## DESIGNATION OF PLACE OF TRIAL

Plaintiff/Relator hereby designates the Federal Court in Kansas City, Kansas as the place

27

of trial in this matter.

/s/ Robert K. Collins
Robert K. Collins, #22675
Collins Law Office, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collinslegal.com


/s/ Theodore J. Lickteig
Theodore J. Lickteig, #12977
Law Offices of Theodore J. Lickteig
12760 West 87th Street, Suite 112
Lenexa, Kansas 66215-2878
(913) 894-1090
tjllawoffice@planetkc.com