## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| THE UNITED STATES OF AMERICA<br>ex rel. Megen Duffy | ) <br> ) <br> ) |
| Plaintiff/Counter Defendant | ) Case No. 2:14-cv-02256-SAC-TJJ |
| | ) |
| v. | ) |
| | ) |
| LAWRENCE MEMORIAL HOSPITAL | ) |
| | ) |
| Defendant/Counter Claimant | ) |
| _____ | ) |

## RELATOR'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Relator Megen Duffy ("Relator"), by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 56, District of Kansas Rules 7.1, 7.6 and 56.1 and the Court's Summary Judgment Guidelines, submits the following Memorandum in Opposition to Defendant Lawrence Memorial Hospital's ("Defendant") Motion for Summary Judgment and Memorandum in Support (Docs. 151 & 152).

# Table of Contents

I.  Introduction ...................................................................................................... 3

II  Nature of the Case  .......................................................................................... 3

III.  Material Facts as to which a Genuine Dispute Exists  .............................. 6

  a. Response to Defendant's Statement of Facts  ........................................... 6

  b. Relator's Statement of Facts  ................................................................... 29

IV.  Summary Judgment Standards .................................................................... 44

V.  Argument and Authorities.............................................................................. 47

  A. LMH is Not Entitled to Judgment as a Matter of Law Regarding Relator's Claim That Delaying Documentation of a Patient's Arrival until After Administering an EKG Caused the Submission of Numerous False Claims .......................................................................... 47

  B. Relator is Baffled By Why Defendant Seeks Judgment as a Matter of Law as to Relator's Claim That the "Chest Pain Audit" Caused Unspecified False Claims. .................................................................... 65

  C. Duffy Can Show That LMH Made False Claims Material to Payment From the Federal Government.  ............................................................. 66

  D. LMH is not entitled to Judgment as a Matter of Law on Relator's Claims of Conspiracy, "Reverse" False Claims, or False Certification of Compliance. .......................................................................................... 75

VI.  Conclusion ...................................................................................................... 82

## I.    <u>INTRODUCTION</u>

This case is brought on behalf of the United States under the Federal  False Claims Act[1] against Defendant Lawrence Memorial Hospital for falsifying records to improperly obtain maximum reimbursement from Medicare and Medicaid.

The False Claims Act has served both to protect the Government as a consumer, and to empower and incentivize individuals with personal knowledge of fraud perpetrated against the government to act as private attorneys general in return for a percentage of the monies they recovered on behalf of the Government. The Act has been amended just five times since its enactment, each time to expand the ability of whistleblowers, known as "relators" under the statute, to recover funds for the Government, and to strengthen protections for relators against the retaliation they typically encounter.

This qui tam suit is brought on behalf of the United States and, as such, the United States remains the primary party of interest in this case.

## II.    <u>NATURE OF THE CASE</u>

---

[1]   False Claims Laws find their origins in 13th century England when a young boy, Henry III, became King upon the death of his father. Opportunists and thieves committing frauds against the monarchy created a need to incentivize honest citizens who possessed knowledge of these frauds to help recover items and property for the monarch in exchange for a bounty. This became the first False Claims or "qui tam" law.  Qui tam is an abbreviation of the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which roughly translated means "he who sues in this matter for the king as well as for himself." The idea was then borrowed by President Lincoln in the midst of the Civil War to address rampant fraud against the Union by unscrupulous contractors who were selling sick horses, contaminated meat, broken rifles, and even ships that didn't float to the Union. On January 16, 1863, Senator Henry Wilson of Massachusetts introduced Senate Bill 467 "to prevent and punish frauds upon the Government of the United States." The False Claims Act was signed into law by President Lincoln in March 1863.

Defendant asserts this case is about clinical judgment to ensure that its patients receive the best possible care. But this is not a malpractice suit, and is not a suit about clinical judgment or what constitutes appropriate clinical care.

Instead, this is a suit to recover money the Government paid based upon records Defendant falsified in order to make its timed quality measures appear better than they actually were, in order to receive "maximum reimbursement from Medicare."

Defendant contends that its practices were utilized strictly to enhance patient care, and even to preserve heart muscle of cardiac patients as Defendant uses phrases such as "time is muscle," "clinical judgment," and "clinical care." However, Defendant offers no explanation as to how altering or falsifying the times in which procedures were performed in any way protects heart muscle or enhances patient care.

Defendant went to great lengths to carry out its scheme. Defendant directed triage nurses to make the time of triage, which necessarily precedes the EKG, match the time automatically generated by the EKG machine. Nurses changed the recorded triage times to match the time of the EKG when the times did not match. Chest pain chart audits were performed to identify charts where triage and EKG times had not matched in the record. And "Chest Pain Audit" forms were utilized to not only identify charts that didn't match, but to correct the nurses who failed to chart the triage time to match the time of the EKG, regardless of when the triage actually happened relative to the EKG.

Defendant destroyed records such as outpatient sign-in sheets of cardiac patients that would record the time a walk-in patient with chest pain or a family member recorded on the form as their time of arrival.

Defendant created phrases such as "patient assessment" as a substitute for the term "triage" because the CMS Specifications Manual requires hospitals to record and report "triage time" but there's no requirement to report anything called "patient assessment time."

Defendant implemented a policy that chest pain patients were to be registered only after the time of the EKG, and this policy was followed. Sometimes admissions representatives would "get ahead of themselves" and register a patient prior to the EKG, which created a registration time in the patient record that preceded the EKG. When this happened, admissions representatives were told that the nurse can "fix" it this time, but "try to get it right."

And, although the CMS Specifications Manual's definition of 'arrival time' permits LMH to abstract a patient's EKG time as 'arrival time' if that EKG time is the earliest recorded time in the patient's record, what Defendant has done with that rule is insidious. It knowingly directs its employees to disregard or conceal any other event that occurred prior to the EKG, such as the time of triage, time of registration, or times on out-patient sign-in forms. The CMS Specifications Manual lists a number of events that must be considered in determining which one came first. The first event is the correct "arrival time"

that must be reported for that patient. In short, Defendant devised a scheme to *not* document events occurring prior to EKG, because only documented events need be abstracted for reporting to CMS.

Defendant urges that Relator cannot identify false claims for payment or approval, feigning ignorance of Relator's claims. As Defendant is aware, false reporting on CMS measures where "arrival time" is involved impacts Defendant's eligibility for adjustments to its Medicare reimbursement rate, as discussed herein. That rate is not paid in a lump sum at the end of a reporting period. Rather, it applies to each and every billing to CMS for Medicare reimbursement. Accordingly, falsification of arrival times renders each and every claim for reimbursement materially false.

Further, Defendant actually possesses the records which evidence false claims submitted under this scheme for payment or approval. Relator requested these records months ago in proper discovery based upon the claims set forth in the Second Amended Complaint. These records have been the subject of a lengthy discovery dispute and multiple Motions to Compel. Defendant has now filed a profoundly premature Motion for Summary Judgment more than six months before the scheduled close of discovery in an apparent attempt to cut short its obligation to produce what would expose it to substantial damages.

## III.   MATERIAL FACTS AS TO WHICH A GENUINE DISPUTE EXISTS

### a. Response to Defendant's Statement of Facts

1.      Undisputed.

2.      Undisputed.

3.      Undisputed.

4.      Undisputed.

5.      Relator objects to purported fact number 5 on the basis that it is not supported by admissible evidence. Defendant cites the Second Amended Complaint but does not cite to particular materials in the record, and therefore has provided no support for the proposition stated, pursuant to Federal Rule of Civil Procedure 56(c)(1).

6.      Undisputed.

7.      Undisputed.

8.      Undisputed.

9.      Undisputed.

10.     Undisputed.

11.     Disputed. Relator testified as follows:

- Q. Focused on the first full paragraph of your response to Interrogatory Number 1, do you believe that each and every time from October 1st, 2010, to the present that LMH took a chest pain patient back to receive an EKG before registering them, do you believe that that is a false claim?

  **A. Yes.**

  Ex. A, Duffy Depo. at 23:16-22.

- Q. But it's your testimony that the occasions that you're aware of where a chest pain patient was not registered and taken back to get an EKG first, that those would constitute a false claim per your allegations?

  **A. Yes.**

  Ex. A, Duffy Depo. at 24:8-13.

- Q. My question is, what was the false or fraudulent claim for payment or approval when a chest pain patient received an EKG before being registered?

  **A. The arrival time was later than it should have been.**

  Q. It's your testimony that, because the chest pain patient's arrival time was later than it should have been, that that was a fraudulent claim for payment or approval?

  **A. Yes.**

  Q. Can you explain, when you say arrival time, what that means to you?

  **A. To me it should mean when the patient walks in the door.**

  Q. When a patient walks in the door, you believe that that should be the arrival time that's used?

  **A. Yes.**

  Ex. A, Duffy Depo. at 24:24-25:16.

- Q. When you testified that when a patient walks in the door, that that should be the arrival time used, are you talking about for Medicare reimbursement?

**A. For anything.**

Q. For anything, any -- any type of record?

**A. Yes. I believe that the arrival time should be the time of arrival.**

Ex. A, Duffy Depo. at 25:18-25.

- Q. And I guess what I'm trying to make sure I understand your testimony is you described arrival time as actually the time you walked in the door, and I -- is that the same -- are you -- are you referring to when they actually sit down and they're registered, or are you talking about when they walk in the door?

  **A. I'm talking about the earliest possible time that someone can walk up to a triage desk and be entered into the computer reasonably.**

  Ex. A, Duffy Depo. at 26:14-23.

- Q. Outside of the situation where a patient is literally unconscious and unable to communicate, is it your testimony that each and every time a chest pain patient was provided an EKG before registering that that constitutes a false or fraudulent claim for payment or approval?

  **A. Yes.**

  Ex. A, Duffy Depo. at 28:15-21.

- **A. [C]hest pain registrations were routinely delayed until after the EKG's were done, which changes the door-to-EKG time.**

  Q. Anything else?

  **A. I believe there are many other things brought up in the complaint.**

Q. And I'm not asking about that. I'm asking about the fraud that you referred to in terms of whether or not the government should have paid. What are you referring to besides the fact that an EKG was performed before a patient was registered?

**A. Triage times were changed to match the EKG time.**

Ex. A, Duffy Depo. at 32:5-17.

- Q. Can you tell the Court what is false about not registering a patient until after an EKG is performed?

  **A. Yes. In medical treatment of chest pain patients, it's important to know when the patient arrives to the hospital and how long it takes to perform an EKG. If the EKG is done and then the patient is triaged and registered, it makes it look like no time at all has elapsed. That's false.**

  Ex. A, Duffy Depo. at 32:20-33:3.

- Q. Your answer to Interrogatory Number 4 reads, At this time Relator has no specific knowledge of each instance in which defendant had possession, custody or control over property or money used or to be used by the United States Government but knowingly delivered or caused to be delivered less than the amount of money or property requested in this interrogatory, and will supplement this answer as discovery continues. Did I read that correctly?

  **A. Yes.**

Q. Okay. Today during your deposition can you tell me, as of today's date, you as the qui tam plaintiff, do you have any specific knowledge in response to this question?

**A. I believe that we do, and I'm not in access to it right now.**

Ex. A, Duffy Depo. at 70:14-71:5.

- Q. Do you know if any patients' times, whether they were triage or registration, were actually changed because of the chest pain audit?

**A. I don't know if they were because of the chest pain audit, but I know that there were other emails stating specifically to make sure that they were changed.**

Ex. A, Duffy Depo. at 92:9-14.

- Q. When you say purposely falsified, totally falsified, would you make sure that you explain that again under oath what you mean by that. You touched on it briefly, and I just want to make sure I understand your testimony.

**A. They are totally falsified because it's an EKG-to-EKG time, not a door-to-EKG time. It was purposely falsified because it was stated outright that having faster door-to-EKG times would maximize CMS reimbursement.**

Ex. A, Duffy Depo. at 123:18-124:2.

- Q. So I want to ask you whether or not you're getting QTR'd and you're being registered or whether you're receiving an EKG, would you agree,

given your nurse experience, that you're being treated as though you're in the emergency department?

**A. No, I would not. If you're getting an EKG before you're registered, then you're not in the system and you can't have orders put on -- put in under your name. Physician cannot look under your previous records to see anything about you. It's not the same.**

Ex. A, Duffy Depo. at 130:7-17.

- Q. What are you talking about in terms of this top tier of hospitals that LMH was placed into because it began administering EKG's before registering?  What is that top tier you're referring to?

**A.    Elaine always talked about needing to be in the top, I think, 11 percent, some percentage which she referred to as the top tier. And by having zero EKG times, LMH was guaranteed to be there.**

Ex. A, Duffy Depo. at 148:20-149:3.

- Q. How about the emergency department at Lawrence Memorial Hospital being directed to keep false records to ensure that it appeared that every patient presenting with chest pains had a door-to-EKG time of less than three minutes which then simply became the practice to record arrival times and EKG times as being one and the same for every such patient?

**A. I don't think I would phrase it as they were directed to keep false records.  They were directed to falsify the records, which were then kept, but it's not like there were two sets, a true one and a false one.**

Ex. A, Duffy Depo. at 164:10-22.

- Q. And I want to ask you today, do you believe it's truthful and accurate that it was LMH's emergency department practice to record arrival times and EKG times on every record as one and the same?

  **A. I believe that that was their policy, yes.**

  Ex. A, Duffy Depo. at 165:21-166:10.

- Q. Can you think of a hospital anywhere, any tier level, any locale, that encourages a health care professional to register a chest pain or cardiac patient before giving that patient an EKG?

  **A. Yes.**

  Q. Which hospital?

  **A. When I worked at Stormont-Vail, all patients were admitted in the order that they arrived.**

  Ex. A, Duffy Depo. at 175:14-21.

- Q. It's your testimony that the Medicare fraud by LMH was -- should have been obvious to everybody, excluding -- excluding housekeeping?

  **A.   It's that it was obvious to me.**

  Q.   Okay.

  **A.   I thought that it would be obvious to other people.**

  Q.   And why was it so obvious to you?

  **A.   Well, I think about computer programming, garbage in garbage out. If you're feeding the wrong data into a program, you don't get the right**

**results from it. If you're feeding door-to-EKG times into your reporting system and they're wrong, then the eventual results that you get are wrong. That's how it appears in my brain.**

Ex. A, Duffy Depo. at 195:19-196:8.

12.   Undisputed.

13.   Undisputed.

14.   Undisputed.

15.   Disputed in part. Relator does not dispute that the IQR and OQR programs are "pay-for-reporting" programs. Relator disputes that "if LMH successfully reports required quality measures to CMS, LMH avoids being assessed penalties. . . ." To obtain the benefits and avoid the penalties of the IQR and OQR programs, LMH must not only report, but *accurately* report, on the quality measures. Ex. C, Hospital IQR FY2015 Checklist, at 6 (highlighted); [Ex. B, Data Accuracy and Completeness Acknowledgments at 3-9.][2] Defendant knows accuracy in reporting is required. Ava Trahan noted in an email to other LMH employees, "[i]f we do not report *accurately* and timely the market basket is jeopardized." [Ex. HHH, 10/26/15 email (highlighted) (emphasis added).] Failure to meet *any* requirement of the IQR program results in a two percentage point reduction in the annual market basket update. [Ex. QQQ, 06/27/12 Ltr. to E. Meyer.]

---

[2] One or more parties have designated certain exhibits to this Memorandum as Confidential Information pursuant to the Agreed Protective Order (Doc 38). Such exhibits are separately submitted to the Court herewith, for *in camera* review only, and are not being filed with the Court. Confidential exhibits are cited in brackets.

16.     Undisputed.

17.     Undisputed.

18.     Undisputed.

19.     Disputed in part. Relator does not dispute that the cited CMS specifications manuals define the "Arrival Time" metric, which is used solely for abstraction purposes, as "[t]he earliest documented time (military time) the patient arrived" at the hospital. However, a CMS contractor informed hospitals, including Defendant, that "[t]he time that the patient first arrives at the institution for the purposes of requesting emergency care should be recorded as the arrival time. This is the first contact, not necessarily the registration time or the triage time." [Ex. D, Hospital Outpatient Quality Reporting Program Support Contractor News, Sept. 2011 at 2, 7 (highlighted).] For ambulatory patients, this is "[t]he time the patient requests care or is asked by ED staff if he/she is here to receive emergency care." [Ex. D at 2.]

20.     Undisputed.

21.     Undisputed.

22.     Undisputed.

23.     Undisputed.

24.     Undisputed but incomplete. Plaintiff incorporates her statements of fact, items 82-89, below, as though fully set forth herein.

25.     Undisputed and immaterial.

26.     Undisputed and immaterial.

27.    Undisputed.

28.    Undisputed and immaterial.

29.    Undisputed.

30.    Disputed. The message Swisher and Harvey conveyed to ED staff was the importance of performing the patient registration (QTR) only *after* performing the EKG. The reason Swisher and Harvey gave for this instruction and practice was that it would increase or "maximize" Medicare reimbursements to Defendant. Ex. E, Depo. Ex. 46 at 1 (highlighted); Ex. F, Swisher Depo. at 21:12-18, 22:15-16; Ex. G, Depo. Ex. 47 at 3 (highlighted); Ex. F, Swisher Depo. at 65:7-18, 66:7-14, 68:6-69:21; Ex. H, Depo. Ex. 49 at 1 (highlighted); Ex. F, Swisher Depo. at 86:3-10, 86:8-89:1; Ex. I, Harvey Depo. at 167:1-16; Ex. J, Depo. Ex. 51 at 2 (highlighted); Ex. F, Swisher Depo. at 96:23-97:18; Ex. K, Depo Ex. 52 at 3 (highlighted); Ex. F, Swisher Depo. at 113:11-114:1; Ex. L, Depo. Ex. 54 at 1 (highlighted); Ex. F, Swisher Depo. at 123:7-124:7, 127:7-14; Ex. M, Depo. Ex. 63 (highlighted); Ex. F, Swisher Depo. at 187:13-188:19; Ex. I, Harvey Depo. at 136:20-137:10; Ex. N, Depo. Ex. 64 (highlighted); Ex. F, Swisher Depo. at 197:22-198:2, 198:13-199:19; Ex. O, Depo. Ex. 65 (highlighted); Ex. F, Swisher Depo. at 205:8-14; Ex. P, Depo. Ex. 66 at 3-4 (highlighted); Ex. F, Swisher Depo. at 205:15-206:3; Ex. Q, Depo. Ex. 69 at 3 (highlighted); Ex. F, Swisher Depo. at 219:16-220:3; Ex. R, Depo. Ex. 70 at 3, 5 (highlighted); Ex. F, Swisher Depo. at 220:4-13; Ex. I, Harvey Depo. at 186:11-187:5; Ex. S, Depo. Ex. 72 at 2 (highlighted); Ex. F, Swisher Depo. at 221:20-222:25; Ex. T, Depo. Ex. 80

(highlighted); Ex. F, Swisher Depo. at 248:24-249:11; Ex. I, Harvey Depo. at 160:6-161:21; Ex. U, Depo. Ex. 87 at 2-3 (highlighted); Ex. F, Swisher Depo. at 254:9-255:3; Ex. V, Depo. Ex. 88 (highlighted); Ex. F, Swisher Depo. at 256:16-257:4; [Ex. W, Depo. Ex. 93]; Ex. I, Harvey Depo. at 190:9-18; [Ex. X, Depo. Ex. 94 (highlighted)]; Ex. I, Harvey Depo. at 198:9-25; [Ex. Y, Depo Ex. 98 at 2 (highlighted)]; Ex. I, Harvey Depo. at 219:11-24; Ex. A, Duffy Depo. at 37:4-11; 38:22-39:7; 123:18-124:2; 148:20-149:3; Ex. Z, McCullough-Baze Depo. at 98:16-24; 167:23-168:3; [Ex. AA, 09/22/10 email]; Ex. BB, 12/26/13 email.

31.     Disputed. Relator has identified numerous additional communications from Swisher and Harvey, written and spoken, that she alleges demonstrate the fraud. Relator incorporates the citations to materials cited in item 30, above, as though fully set forth herein. Relator also incorporates her own deposition testimony, as set forth in item 11, above, as though fully set forth herein. Minutes of a meeting of Defendant's Organizational Quality Improvement Council on June 11, 2011, at which Joan Harvey was present, state that there was a "[d]iscussion on median time to ECG decreased to '0' by registering patient after ECG done." [Ex. CC, OQIC Agenda at 5 (highlighted)]. Summer Skeet gave a presentation to the Organizational Quality Improvement Council that included that same topic. [Ex. KKK, Depo. Ex. 122 at 3]; Ex. MM. Skeet Depo. at 164:16-165:22.

32.     Disputed. Relator testified as follows:

Q. It's your testimony that the Medicare fraud by LMH was -- should have been obvious to everybody, excluding -- excluding housekeeping?

**A.  It's that it was obvious to me.**

Q.  Okay.

**A.  I thought that it would be obvious to other people.**

Q.  And why was it so obvious to you?

**A.  Well, I think about computer programming, garbage in garbage out. If you're feeding the wrong data into a program, you don't get the right results from it. If you're feeding door-to-EKG times into your reporting system and they're wrong, then the eventual results that you get are wrong. That's how it appears in my brain.**

Ex. A, Duffy Depo. at 195:19-196:8.

33.    Disputed. As noted with respect to item 30, above, the message Swisher and Harvey conveyed to ED staff was the importance of performing the patient registration (QTR) only *after* performing the EKG. The reason Swisher and Harvey gave for this instruction and practice was that it would increase or "maximize" Medicare reimbursements to Defendant. Relator incorporates the citations to materials cited in item 30, above, as though fully set forth herein. This instruction and practice is demonstrated even in the "nine communications" cited by Defendant. Defendant's Ex. H (Doc 152-3) at p.1 ("CMS Changes—Door to EKG Time Goal for Best Reimbursement is 3 min"), p.2 ("The ED physicians have expressed concern with trading 'zero' minute EKGs for a delay in the QTR

for them to enter orders on cardiac patients."), p.5 ("LOTS of 'zero' times (due to EKG and registration occurring almost simultaneously)"), p.14 ("CMS has new benchmark with greater reimbursement for those that are the top achievers of 3 minute door to EKG times. As hard as we have tried and as good as we are this is physically impossible with our current flow. . . . [Admissions] do not want to impair our EKG times so they will wait for us to tell them to register ambulances or straight back jack patients."); p.17 ("ER has been given the challenge of performing EKGs on patients meeting certain requirements within 3 minutes. If we perform QTR too quickly they will not meet the 3 minute requirement."), pp.21-22 ("Current benchmark is 10 minutes from door to EKG with LMH's goal being 5 mins. In 2012 CMS (Medicare) will reimburse hospitals at a greater rate for those in the top 10%-- which is where the 3 minute time comes in. The 2012 payments will be based on 2011 data. Patients with an acute onset on chest pain or associated symptoms should have EKG done prior to QTR. Triage techs should not be told 'go ahead and register, I will be right there'."), p.28 ("Yes, we are looking at other creative ways to expedite our processes to meet the '3 minute goal'. The key factor here will be when we complete the registration process, so when in doubt-wait to register until that 12 lead is completed."), p.31 ("CMS has officially changed their 'gold standard' for door to EKG time to 3 minutes. . . Door to EKG is 3, count 'em 3 minutes!!! We can do this, but it will require a change in current practice.").

34.    Undisputed.

35.    Disputed in part. Immediately preceding the language quoted by Defendant is the following:

> Clarification of our new goal to obtain the door to EKG time in 3 minutes. The CMS guidelines for MAXIMUM REIMBURSEMENT will be changing to door to EKG time of 3 minutes, so this is our new goal. We will be revising our current chest pain protocol to reflect our new system of processing these patients. It will include:

Defendant's Exhibit J (Doc 152-15) at 3.

36.    Disputed. Relator testified as follows, with respect to the transparency of the fraud:

> Q. It's your testimony that the Medicare fraud by LMH was -- should have been obvious to everybody, excluding -- excluding housekeeping?
>
> **A.  It's that it was obvious to me.**
>
> Q.  Okay.
>
> **A.  I thought that it would be obvious to other people.**
>
> Q.  And why was it so obvious to you?
>
> **A.   Well, I think about computer programming, garbage in garbage out. If you're feeding the wrong data into a program, you don't get the right results from it. If you're feeding door-to-EKG times into your reporting system and they're wrong, then the eventual results that you get are wrong. That's how it appears in my brain.**
>
> Ex. A, Duffy Depo. at 195:19-196:8.

37.    Undisputed.

38.     Disputed in part. Relator testified that, to her, "arrival" is "the earliest possible time that someone can walk up to a triage desk and be entered into the computer reasonably." Ex. A, Duffy Depo. at 26:14-23.

39.     Disputed. The cited portions of Relator's deposition transcript contain no such testimony. Ex. A, Duffy Depo. at 25:9-25; 34:1-8. Specifically, Relator did not testify that "there is no practical way to record the actual moment a patient walks through a hospital's doors."

40.     Disputed. The cited portion of Relator's deposition transcript contains no such testimony. Ex. A, Duffy Depo. at 34:1-8.

41.     Undisputed.

42.     Disputed. Relator testified that Defendant's failure to accurately document patient arrival times resulted in false claims for payment or approval and that, in the case of an unconscious patient, "it would be incumbent on the staff to treat the patient in a timely and appropriate manner despite whether or not they could register them." Ex. A, Duffy Depo. at 27:25-28:14.

43.     Disputed. Ms. Swisher testified as follows:

> Joan and I have discussed this, and I remember we're not trading anything for anything.  The concern with the docs was sometimes it was taking longer to then get that quick reg done after we captured the 12 lead and rightly so. The idea and what the training had always been is if you can make a simultaneous that would be great.  And I think when we got the dance kind of more

choreographed I think we were able to do that more succinctly. But initial -- initially, especially different times of the day with admissions being busy who is getting that done? There may have been delay. And I can understand -- of course, part of it is it's a different process. Doctors, like any other human beings, don't always like a change. So, again, it wasn't that we were delaying. It was it wasn't expedientially getting in as quickly as the docs wanted. So, again, we worked on that process to get that dance choreographed so that we could get that process whittled down so we could do it simultaneously if we could. That would be awesome. That's what we tried to do.

Ex. F, Swisher Depo. at 214:23-216:5.

44.     Disputed. Swisher and Harvey regularly trained Relator to delay registration of cardiac and chest pain patients. Such training was for the express purpose of increasing or maximizing reimbursement from CMS. Relator incorporates the materials cited in response to item 30, above, as though fully set forth herein.

45.     Undisputed and immaterial.

46.     Undisputed and immaterial.

47.     Disputed. When asked during her deposition if she was able, at that time, "to explain how recording EKG time is a claim for reimbursement," Relator responded, "Not exactly, no." Ex. A, Duffy Depo. at 35:17-19. Relator testified,

"Well, I think about computer programming, garbage in garbage out. If you're feeding the wrong data into a program, you don't get the right results from it. If you're feeding door-to-EKG times into your reporting system and they're wrong, then the eventual results that you get are wrong." Ex. A, Duffy Depo. at 195:19-196:8.

48.    Undisputed and immaterial.

49.    Disputed. The cited testimony is that Relator could not personally, at the time of her deposition, identify any specific amounts or payments that LMH received from the federal government. Ex. A, Duffy Depo. at 77:21-78:20; 110:10-111:1. Relator further incorporates her response Defendant's purported fact 74, below, as though fully set forth herein. Defendant received the full "annual percentage update" for each of the years 2010 through 2016. Ex. DD, Hospitals Receiving Full APU (received from CMS by subpoena). Defendant also received annual adjustments to its Medicare reimbursement rate through the Hospital Value Based Purchasing program. [Exs. FF & GG, examples of HVBP summaries].

50.    Disputed. The cited testimony is that Relator could not personally, at the time of her deposition, identify anyone at LMH "who actually submitted a false or fraudulent claim for payment or approval" based on giving an EKG prior to the OQR process. Ex. A, Duffy Depo. at 35:20-36:10. Defendant has disclosed that individuals who may have submitted or reviewed false data submitted to CMS for payment or approval include Jennifer Brooks, Karin Feltman, Melissa

Freed, Beni Goebel, Joan Harvey, Lori Howard, Jill Ice, Kristin Miller, Summer Skeet, Amber Styles, Tammie Trefz, Sarah Weipert, Kristin Brassart, Ava Trahan, and Paula Westphal. Ex. KK, LMH Supp. Answers to P's First Irogs. at 8.

51.    Undisputed.

52.    Undisputed and immaterial.

53.    Undisputed and immaterial.

54.    Undisputed and immaterial.

55.    Undisputed.

56.    Disputed. Relator testified, "There is no false information reflected. It's a false direction—or a direction that results in false information." Ex. A, Duffy Depo. at 48:24-49:1.

57.    Undisputed.

58.    Undisputed.

59.    Undisputed.

60.    Disputed. Relator testified, "At times there could be an EKG being run while the nurse was putting in a triage note." Ex. A, Duffy Depo. at 49:8-13. "A triage note is a form on the computer that has specific fields. The triage nurse talks to the patient being triaged, populates the form, and then saves it." Ex. A, Duffy Depo. at 49:24-50:2. Triage is a process which occurs prior to creating the triage note, at the time patients are first greeted in the ED. Ex. I, Harvey Depo. at 39:7-9 ("[P]resenting at the desk is. . . a triage process.").

61.    Disputed. One of the criteria on the Chest Pain Audit form, "Triage time matches time on EKG," instructed nurses to record EKG time as triage time for all chest pain patients. Defendant's Ex. I (Doc. 152-14); [Ex. Y, Depo. Ex. 98 at 2]; Ex. I, Harvey Depo. at 224:9-22, 225:14-22. If this instruction was not followed, Defendant changed the triage time to match the EKG time. Ex. A, Duffy Depo. at 51:22-52:1.

62.    Undisputed and immaterial.

63.    Disputed in part. The quoted testimony is undisputed. Relator disputes that she "conceded" anything with this testimony. Ex. A, Duffy Depo. at 48:21-49:1.

64.    Disputed. Swisher testified that the criteria "Triage time matches time on EKG" was used to make sure the patient documentation "represents the care that we gave chronologically." Swisher's efforts to manipulate the chronology of events in patient documentation were motivated by CMS guidelines for Medicare reimbursement. Ex. E, Depo. Ex. 46; Ex. F, Swisher Depo. at 176:17-24.

65.    Undisputed.

66.    Undisputed.

67.    Undisputed.

68.    Disputed. Relator reported to the hotline that Defendant was "falsifying patient charts," that it was doing this "in order to get higher reimbursements," and that "this had been going on for over three years." Defendant's Ex. L (Doc 152-17) at 3.

69.     Undisputed and immaterial.

70.     Undisputed and immaterial.

71.     Undisputed and immaterial.

72.     Disputed. The cited exhibit refers to a series of events, logged by NCI AdvanceMed, documenting that entity's investigation into Relator's claims against Defendant. The last entry states:  "In last matrix, PI Manager Fisher advised to close investigation as CMS is aware of quality issue. We cannot continue to pend for contact information from CMS COR. Send expedited referral. PI Supervisor Lindsey sent email to PI Manager Fisher to clarify direction of handling this investigation. Defendant's Ex. L (Doc 152-17) at 13.

73.     Undisputed.

74.     Disputed in part. Relator does not dispute that "LMH's HVBP payments increased from fiscal year 2014 to fiscal year 2015." Relator disputes that, in fiscal year 2014, LMH "was paid a total of $68,071.68" and disputes that, in fiscal year 2015, LMH "was paid a total of $123,326.54." Defendant produced a slide stating as follows:

**Incentive/Penalty Programs**

• HHS/CMS

o Value-Based Purchasing

▪ First performance period was July 2011–March 2012. We earned back the 1% reduction as well as an additional 0.5%.

▪ Second performance period was April 2012—December 2012. We earned back the 1.25% reduction as well as 0.25%.

▪   Third performance period was January 2013—December 2013. Dollars at risk 1.50%.

▪   Our current performance period January 2014—December 2014 has 1.75% dollars at risk.

Resource: Ava O'Flannagan and Ann Marie Boncella

[Ex. EE, Incentive/Penalty Programs]. Pursuant to HVBP, Defendant risks its entire "reduction" for each fiscal year, as set forth in this slide. *See also* 42 C.F.R. 412.060, 412.162; [Ex. FF, FY2014 HVBP Summary]; [Ex. GG, FY2015 HVBP Summary]. Joseph Pedley is Defendant's Vice President and Chief Financial Officer. Defendant's Ex. M (Doc. 152-18) at 1. Mr. Pedley stated in an email that, for fiscal year 2014, "LMH amount at risk for loss is approximately $625,000 (1.25%)." [Ex. HH, 07/31/13 email]. Because Defendant actually had a net positive change that year of an additional .25%, Mr. Pedley notes that "our payments will actually increase by about $125,000 (.25%), so I guess we could say our quality initiatives have paid off to the tune of $750,000." [Ex. HH]. Thus, the amount Defendant was paid under HVBP in fiscal years 2014 and 2015 is the entire "reduction" (amount at risk), in addition to any excess. Defendant now incorrectly states that only the excess, above the reduction, was paid under HVBP.

75.   Disputed. Relator testified, "I can't possibly know everybody who had anything to do with it. I can only say the people that I saw talking about it." Ex. A, Duffy Depo. at 60:17-61:56. Relator testified that Ryan Jackson failed to revise LMH's policy of delaying registration until after EKG for chest pain

patients. Ex. A, Duffy Depo. at 61:13-15, 62:9-15, 65:15-19. Relator testified that Karen Shumate gave a presentation on "meaningful use and Obamacare. And she had a lot of specific examples about how LMH could lose money under the new policies and procedures." Ex. A, Duffy Depo. at 62:16-22, 68:1-12. Relator testified that she has personal knowledge of communications of Elaine Swisher and Joan Harvey which form the basis of Relator's conspiracy claim, and that she has information causing her to reasonably believe Ryan Jackson and Karen Shumate participated in the conspiracy as well. Ex. A, Duffy Depo. at 63:24-65:23, 66:9-20.

76.    Disputed. Relator testified that the referenced individuals witnessed the delay of registration until after EKG for cardiac or chest pain patients, as well as other surrounding facts. Ex. A, Duffy Depo. at 134:24-135:7, 136:3-6, 137:3-9, 137:10-25.

77.    Disputed. Relator testified that, at the time of her deposition, she did not have the data available to answer Defendant's counsel's question asking her to identify specific false certifications. Ex. A, Duffy Depo. at 74:15-24. Relator has knowledge of multiple false certifications in violation of the FCA including, but not limited to, Attestations of Compliance with Section 6032 of the Federal Deficit Reduction Act. Exs. C and D to Relator's Third Motion to Compel (Docs. 136-3, 136-4). Hospitals such as Defendant were also required to electronically submit an annual Data Accuracy and Completeness Acknowledgement ("DACA") in order to participate in the IQR program. [Ex. II, 04/01/14 email]; [Ex. JJ,

05/04/15 email]. Defendant executed these acknowledgements for each year. [Ex. B, DACAs at 3-9]. Relator testified that the individuals making certifications on behalf of LMH knew they were false. Ex. A, Duffy Depo. at 75:6-11.

78.     Disputed. Relator did not testify that the *only* basis for her allegation that LMH made a false certification of compliance is that she had "heard Joan and Elaine laughing in the hallway about how CMS was going to start noticing if they had zero EKG times and they need to make them longer." Rather, she testified that, at the time of her deposition she, personally, had no additional basis for her assertion that Defendant made certifications of compliance that were false. Ex. A, Duffy Depo. at 75:6-76:7. Relator testified that, at the time of her deposition, she did not have the data available to answer Defendant's counsel's question asking her to identify specific false certifications. Ex. A, Duffy Depo. at 74:15-24.

79.     Disputed. As the testimony quoted by Defendant states, Relator testified that she, personally, at the time of her deposition, had no specific knowledge in response to Interrogatory 4. Ex. A, Duffy Depo. at 71:16-19.

80.     Disputed. Relator testified that she, personally, at the time of her deposition, had no specific knowledge in response to Interrogatory 5. Ex. A, Duffy Depo. at 72:13-17.

### b.  Relator's Statement of Facts

**If the patient record is inaccurate, the "arrival time" reported to CMS will consequently be false.**

81.    On a quarterly basis, Defendant's Quality Services Department submits data to CMS that is abstracted from patient records. Ex. KK, D's Supp. Answers to P's First Irogs. at 8.

82.    According to the CMS Specifications Manual, all documentation in the medical record must be timed, dated and authenticated. Defendant's Ex. F-2 (Doc 152-8) at 1.

83.    Because patient records are taken "at face value" when abstracting, the accuracy of the data sent to CMS is completely dependent on the accuracy of events recorded in patient records in the first instance. Defendant's Exhibit F (Doc 152-6), Affidavit of A. Trahan at 2 (¶9), 8, 12, 16, 20, 24, 28, 32, 36, 40, 44, 47; Ex. LL, Depo. Ex. 56; Ex. MM, S. Skeet Depo. at 145:9-18.

84.    Patient "arrival time" impacts a variety of quality measures reported to the Centers for Medicare and Medicaid Services. Ex. BB, 12/26/13 email.

85.    According to the CMS Specifications Manual, "arrival time" is "[t]he earliest *documented* time (military time) the patient arrived at the hospital." Defendant's Exhibit F (Doc 152-6), Affidavit of A. Trahan at 7, 11, 15, 19, 23, 27, 31, 35, 39, 43, 47 (emphasis added).

86.    Thus, undocumented events, and events the documentation of which is discarded, cannot become the "arrival time" reported to CMS. Defendant's Exhibit F (Doc 152-6), Affidavit of A. Trahan at 2 (¶9), 7, 8, 11, 12, 15, 16, 19, 20, 23, 24, 27, 28, 31, 32, 35, 36, 39, 40, 43, 44, 47; Ex. LL, Depo. Ex. 56; Ex. MM, S. Skeet Depo. at 145:9-18.

87.     Arrival time is to be abstracted from a finite universe of "only acceptable sources," which CMS intends to include "any documentation which reflects processes that occurred in the ED or hospital." Defendant's Exhibit F (Doc 152-6), Affidavit of A. Trahan at 8, 12, 16, 20, 24, 28, 32, 36, 40, 44, 48.

88.     The "only acceptable sources" include the Emergency Department record, the Nursing admission assessment/admitting note, the Observation record, Procedure notes, and the Vital signs graphic record. Defendant's Exhibit F (Doc 152-6), Affidavit of A. Trahan at 9, 13, 17, 21, 25, 29, 33, 37, 41, 45, 49.

89.     "The source 'Emergency department record' includes any documentation from the time period that the patient was an ED patient—e.g., ED face sheet, ED consent/Authorization for treatment forms, EO/Outpatient Registration/sign-in forms, ED vital sign record, triage record, ED physician orders, ECG reports, telemetry/rhythm strips, laboratory reports, x-ray reports." Defendant's Exhibit F (Doc 152-6), Affidavit of A. Trahan at 24, 28, 32, 37, 41, 45, 49.

90.     Swisher and Harvey testified that there may be up to five patients waiting to see the triage person at the entrance of the Emergency Department. Ex. I, Harvey Depo. at 88:11-15; Ex. F, Swisher Depo. at 78:22-23.

91.     "Triage" means "to sort" and involves prioritizing patients into different categories for treatment purposes. Ex. I, Harvey Depo. at 78:14-79:3; Ex. Z, McCullough-Baze Depo. at 72:19-73:20.

92.     Triage begins at the triage desk when the patient walks into the Emergency Department. Ex. F, Swisher Depo. at 80:3-81:5.

93.     The triage process also includes such things as determining that a patient has chest pain, is not a child with a runny nose whose chest pain may be more likely related to an infection than to acute myocardial infarction, is assessed to be a patient at risk of having a heart attack, and is ordered ahead of all less urgent patients to receive an EKG under Defendant's "Straight back, Jack" policy. Ex. I, Harvey Depo. at 98:25-99:24.

94.     Elaine Swisher used phrases such as "patient assessment" as a substitute for the term "triage." Ex. F, Swisher Depo. at 78:21-80:17.

95.     CMS has never informed LMH or any other hospital that it could use the ECG time as the arrival time of all cardiac patients, to the exclusion of any other prior indicators of hospital arrival by the patient such as triage record, nursing assessment, admitting notes, procedure notes and vital sign records or physical presence of a patient still waiting to be seen. Subpoena on CMS (Doc 56); Ex. RRR, CMS Response to Subpoena at ¶¶16-24.

**Defendant destroys patient records that include the correct "arrival time."**

96.     Joan Harvey began working for LMH in November of 2001 and was Director of the LMH's Emergency Department from November of 2011 through June or July of 2013. Ex. I, Harvey Depo. at 18:18-24, 28:18-30:2. Ms. Harvey then worked for LMH in the Quality Department for approximately six months in late 2013 and early 2014. Ex. I, Harvey Depo. at 28:24-29:7. Ms. Harvey was then Interim Director of the Emergency Department for approximately three

months in 2014, concluding Labor Day weekend in September of 2014. Ex. I, Harvey Depo. at 29:8-12, 30:10-12.

97.     Elaine Swisher is the Clinical Coordinator for LMH's Emergency Department and has held that position since December of 2008. Ex. F, Swisher Depo. at 7:17-24.

98.     A triage tech or nurse greets patients upon arrival to Defendant's Emergency Department, and gets information from the patient, including the nature of the medical issue. Ex. I, Harvey Depo. at 37:8-10; 37:20-38:3; Ex. OO, Bones Depo. at 56:18-57:9.

99.     Defendant uses an "interim form" at the entrance to the ED to record such things as "chief complaint, time, doctor, pharmacy, various different things. Allergies.  Medications." Ex. I, Harvey Depo. at 39:10-16.

100.    Defendant discarded the interim forms after use. Ex. I, Harvey Depo. at 68:17-69:3.

101.    As a matter of practice, Defendant maintains "triage sheets" to write down information as patients are coming into the ED. The information recorded on triage sheets includes chief complaint, allergies, and "basic information that you can then convert with more detail into a triage note," as well as vital signs including blood pressure, pulse respirations, temperature, and oxygen saturation. Ex. I, Harvey Depo. at 220:22-221:10, 221:16-22, 221:24-222:1.

102.    A triage note is electronic nursing documentation "where you go in electronically and write more details about the patient." Ex. I, Harvey Depo. at 222:2-13.

103.    Defendant instructed ED staff to write down the EKG time on triage sheets. [Ex. Y, Depo. Ex. 98 at 2]; Ex. I, Harvey Depo. at 219:11-220:8.

104.    Defendant instructed ED staff to "match" the EKG time to the "triage time" on the triage note, stating "These need to be the same." [Ex. Y, Depo. Ex. 98 at 2]; Ex. NN, Depo. Ex. 71 at 2.

105.    Defendant routinely discards triage sheets after the information is transferred to the electronic triage notes. Ex. I, Harvey Depo. at 222:14-17.

106.    Brenda Bones has been Defendant's Admissions Manager since March 10, 2008 and supervises 47 employees. Ex. OO, Bones Depo. at 14:3-10.

107.    When an Emergency Department patient is registered ("QTR"), a time stamp is created in Defendant's STAR computer system. Ex. OO, Bones Depo. at 59:4-18.

108.    Defendant's admissions representatives wrote down patient information on "face sheets," for later entry into the computer system. Ex. OO, Bones Depo. at 39:13-21.

109.    Defendant shredded the face sheets after use. Ex. OO, Bones Depo. at 39:22-24.

110.   Defendant's admission representatives used "cheat sheets" to record patient information that was not on the face sheets. Ex. OO, Bones Depo. at 40:6-41:1.

111.   Defendant shredded the cheat sheets after use. Ex. OO, Bones Depo. at 41:2-4.

112.   Triage notes, triage sheets, face sheets, and cheat sheets are all part of the "Emergency Department record." Defendant's Exhibit F (Doc 152-6), Affidavit of A. Trahan at 24, 28, 32, 37, 41, 45, 49; Ex. BB, 12/26/13 email.

**Defendant changed triage times and registration times so as to alter "arrival times" reported to CMS.**

113.   Defendant's employees have the ability to simply change a patient's QTR time in the computer system. Ex. OO, Bones Depo. at 59:19-60:1.

114.   Crystal Rocha was a Registration Clerk in LMH's Emergency Department from May of 2012 to May of 2013. Ex. MMM, Rocha Declaration at ¶2.

115.   If a cardiac or chest pain patient in the ED was registered prior to the EKG being performed, Defendant would change the patient's record to show the EKG was done within a few minutes of the registration or was done at exactly the same time as the EKG. Ex. MMM, Rocha Declaration at ¶11.

116.   Brenda Bones informed Crystal Rocha and other ED employees that they would get in trouble if they registered cardiac or chest pain patients prior to the EKG being performed, because Defendant wouldn't get paid by Medicare. Ex. MMM, Rocha Declaration at ¶12, 14, 17.

117.   Defendant's ED nurses would sometimes change the registration times of cardiac or chest pain patients in the patient records. Ex. MMM, Rocha Declaration at ¶13.

118.   If an ED employee registered a chest pain patient before the EKG was performed, nurses would sometime say, "That's okay we'll change the arrival time" or, "We can change the time this time, but try to get it right," or "we can fix it." Ex. MMM, Rocha Declaration at ¶16.

119.   Defendant changed triage times to match EKG times. Ex. A, Duffy Depo. at 32:5-17; Defendant's Ex. I (Doc. 152-14); [Ex. Y, Depo. Ex. 98 at 2]; Ex. I, Harvey Depo. at 224:9-22, 225:14-22; Ex. A, Duffy Depo. at 51:22-52:1, 92:9-14.

120.   Jeanine McCullough-Baze is an emergency nurse who worked for Defendant for approximately five years and whose immediate supervisor was Joan Harvey. Ex. Z, McCullough-Baze Depo. at 15:10-13, 18:18-19:9.

121.   Ms. McCullough-Baze testified as follows:

Q.   And I'm asking you this, Jeanine McCullough-Baze, because you asked the question. When you say triage times are being made the EKG time, what are you referring to?

A.   **The time that you got your vital signs, your patient history, everything.  They wanted those times to be the same exact time as EKG time, so it made the door-to-EKG time look like it was zero minutes.**

Q.    And your testimony, your words, would be that, by trying to make it the exact same time, it's either likely illegal or morally questionable or both?

**A.   Yes, because Elaine and Joan told us that it would increase our Medicare/Medicaid reimbursement. And I didn't understand why we needed to do that because we were already meeting the benchmark most of the time.**

Q.   What was the benchmark most of the time?

**A.    That three-minute window. Because we already did EKG's immediately when a patient got there. But they were just -- I felt like they were trying to basically, I don't know, pad the statistics a little bit.  And it wasn't necessary.  We were already meeting the mark.**

\*       \*       \*

**A.   They wanted -- they, meaning Joan and Elaine, wanted triage time to be the exact same as the EKG.  They wanted you to take the EKG, look at it, and use that as the time to enter your triage note, not the time that it actually occurred.**

Q.   And what do you base that on?

**A.   What we were told.**

Q.   Okay. Orally and emails?

**A.   And in the policy, yes.**

Q.  Okay.  Is it your testimony that the time of triage should never match the time of EKG?

**A.  My testimony is the time of triage should be the time that the triage occurred.**

Ex. Z, McCullough-Baze Depo. at 89:8-99:6, 100:23-101:10.

122.   During a staff meeting, Jeanine McCullough-Baze questioned Defendant's practice of making triage times match EKG times as possibly illegal, and Elaine Swisher responded, "if you don't like it, there's other hospitals." Ex. Z, McCullough-Baze Depo. at 93:22-98:7.

123.   Time elapses between the time of triage and the time EKG is actually completed and the EKG monitor prints the automatically generated time. This process can involve getting the patient to a room within the ED, locating an EKG monitor if one is not physically present in the room, sometimes charging the EKG monitor, and removing the patient's shirt and/or bra. It involves measuring the precise locations for the 12 leads of the EKG to be placed on the patient sometimes shaving the locations where the leads will be placed, and then running the EKG, which sometimes must be run more than once if it did not get a correct read. Ex. Z, McCullough-Baze Depo. at 185:5-188:2.

124.   Emergency Department nurses followed Defendant's instructions and changed triage times in patient records. Ex. Z, McCullough-Baze Depo. at 179:7-180:11.

125.    Former LMH admissions clerk Christina Neibarger wrote an email to LMH CEO Gene Meyer, confirming that Defendant falsified times in patient records and the other allegations Relator makes against Defendant. [Ex. III, 08/31/15 email]; Ex. JJJ, subpoena response confirming identity of Neibarger.

**Defendant instituted a policy of delaying registration until after EKG, for the express purpose of increasing Medicare reimbursements.**

126.    Chest pain patients are registered differently than other patients presenting to Defendant's Emergency Department, in that they are taken "straight back" and registration is delayed until a nurse called admissions personnel. Ex. OO, Bones Depo. at 117:12-118:1.

127.    Swisher instructed an Emergency Department employee not to register (QTR) chest pain patients at triage and stated "I know it's kind of cheating." Ex. M, Depo. Ex. 63.

128.    Swisher and Harvey conveyed to ED staff the importance of performing the patient registration (QTR) only *after* performing the EKG. The reason Swisher and Harvey gave for this instruction and practice was that it would increase or "maximize" Medicare reimbursements to Defendant. 12. Ex. E, Depo. Ex. 46 at 1 (highlighted); Ex. F, Swisher Depo. at 21:12-18, 22:15-16; Ex. G, Depo. Ex. 47 at 3 (highlighted); Ex. F, Swisher Depo. at 65:7-18, 66:7-14, 68:6-69:21; Ex. H, Depo. Ex. 49 at 1 (highlighted); Ex. F, Swisher Depo. at 86:3-10, 86:8-89:1; Ex. I, Harvey Depo. at 167:1-16; Ex. J, Depo. Ex. 51 at 2 (highlighted); Ex. F, Swisher Depo. at 96:23-97:18; Ex. K, Depo Ex. 52 at 3 (highlighted); Ex. F, Swisher Depo. at 113:11-114:1; Ex. L, Depo. Ex. 54 at 1 (highlighted); Ex. F,

Swisher Depo. at 123:7-124:7, 127:7-14; Ex. M, Depo. Ex. 63 (highlighted); Ex. F, Swisher Depo. at 187:13-188:19; Ex. I, Harvey Depo. at 136:20-137:10; Ex. N, Depo. Ex. 64 (highlighted); Ex. F, Swisher Depo. at 197:22-198:2, 198:13-199:19; Ex. O, Depo. Ex. 65 (highlighted); Ex. F, Swisher Depo. at 205:8-14; Ex. P, Depo. Ex. 66 at 3-4 (highlighted); Ex. F, Swisher Depo. at 205:15-206:3; Ex. Q, Depo. Ex. 69 at 3 (highlighted); Ex. F, Swisher Depo. at 219:16-220:3; Ex. R, Depo. Ex. 70 at 3, 5 (highlighted); Ex. F, Swisher Depo. at 220:4-13; Ex. I, Harvey Depo. at 186:11-187:5; Ex. S, Depo. Ex. 72 at 2 (highlighted); Ex. F, Swisher Depo. at 221:20-222:25; Ex. T, Depo. Ex. 80 (highlighted); Ex. F, Swisher Depo. at 248:24-249:11; Ex. I, Harvey Depo. at 160:6-161:21; Ex. U, Depo. Ex. 87 at 2-3 (highlighted); Ex. F, Swisher Depo. at 254:9-255:3; Ex. V, Depo. Ex. 88 (highlighted); Ex. F, Swisher Depo. at 256:16-257:4; [Ex. W, Depo. Ex. 93]; Ex. I, Harvey Depo. at 190:9-18; [Ex. X, Depo. Ex. 94 (highlighted)]; Ex. I, Harvey Depo. at 198:9-25; [Ex. Y, Depo Ex. 98 at 2 (highlighted)]; Ex. I, Harvey Depo. at 219:11-24; Ex. A, Duffy Depo. at 37:4-11; 38:22-39:7; 123:18-124:2; 148:20-149:3; Ex. Z, McCullough-Baze Depo. at 98:16-24; 167:23-168:3; [Ex. AA, 09/22/10 email]; Ex. BB, 12/26/13 email.

129.   Defendant trained Ms. Rocha and other ED employees to register cardiac or chest pain patients only after EKG, and that this had to be done in order for Defendant to receive money from CMS. Ex. MMM, Rocha Declaration at ¶¶4, 5.

130.   ED Physicians "expressed concern with trading 'zero' minute EKGs for a delay in the QTR for them to enter orders on the cardiac patients." Ex. PP, Depo. Ex. 67.

131.   Delay in registering chest pain patients results in delay in getting orders entered by doctors and "possible negative patient consequences." Ex. QQ, Depo. Ex. 83 at 2; [Ex. RR, Depo. Ex. 152 at 2].

132.   For the second quarter of 2010, Defendant had a median arrival-to-EKG time in the ED of 9.3 minutes and was exploring ways to improve that time. Ex. SS, Depo. Ex. 86.

133.   For at least eleven quarters beginning in the first quarter of 2011, Defendant reported to CMS median arrival-to-EKG times of zero minutes. Ex. KK, D's Supp. Answers to P's First Irogs. at 8; Ex. PPP, Depo. Ex. 138, CMS Quality Measures Dashboard.

134.   Immediately prior to October 2010, in the second and third quarters of 2010, Defendant reported Median Time to ECG as 9.3 minutes and 12.2 minutes, respectively. Ex. KK, D's Supp. Answers to P's First Irogs. at 8.

135.   For patients arriving in the ED other than by ambulance, it is not possible to obtain an EKG on such a patient within zero minutes from the time the patient first makes contact with ED personnel. [Ex. TT, Depo. Ex. 92]; Ex. Z, McCullough-Baze Depo. at 185:5-188:25; Ex. F, Swisher Depo. at 71:7-8, 71:25-73:12, 73:15-19.

136.   Defendant's admissions representatives would sometimes "get ahead of themselves" and register chest pain patients before being asked to do so. Ex. OO, Bones Depo. at 38:10-19.

**Defendant altered terminology, without altering any practice, for the express purpose of improving "throughput" times reported to CMS.**

137.   Two of the timed measures reported to CMS involve "ED throughput," which includes measuring from the time of decision to admit to ED departure. Ex. EEE, S. Skeet throughput explanation; Ex. FFF, New CMS Core Measures.

138.   In May of 2014, CMS informed Defendant that Defendant had to abstract the date and time for "probable admit" as the date and time for the CMS data element "Decision to Admit." Ex. [UU, Depo. Ex. 101]; Ex. VV, ED Throughput Tracking Instructions for Audits.

139.   Because using the date and time recorded for "probable admit" as the date and time for the CMS element "Decision to Admit" would "totally mess up the time to depart for nursing," Defendant determined it needed to "come up with verbiage that is not a synonym for decision to admit, that indicates the action they intend." [Ex. UU, Depo. Ex. 101].

140.   Without changing any actual clinical practice or procedure, Defendant devised the term "complex patient" to replace "probable admit" in its patient records. Ex. C to P's Second Mtn to Compel (Doc 116-3).

**Defendant used "admit" times from patient records to abstract "arrival time," in direct contradiction of the CMS Specifications Manual.**

141.   Defendant used the admission time in its electronic patient records to capture "arrival time," to the exclusion of other "arrival time" time events, when abstracting for reporting on measures to CMS. Ex. FFF, New CMS Core Measures.

142.   Defendant quizzed employees on whether they were using the "admit" time in the patient records to capture "arrival time" during abstraction. Ex. GGG, Quiz.

143.   The CMS Specifications Manual instructs as follows with respect to determining "arrival time":  "Review only the acceptable sources to determine the earliest time the patient arrived at the hospital. This may differ from the admission time." Later versions state, "[t]he arrival time may differ from the admission time." Defendant's Exhibit F (Doc 152-6), Affidavit of A. Trahan at 8, 12, 16, 20, 24, 28, 32, 37, 41, & 45.

## Defendants falsely certified compliance with the False Claims Act education requirement of Deficit Reduction Act.

144.   Defendant submitted Attestations of Compliance with Section 6032 of the Federal Deficit Reduction Act. Exs. C and D to Relator's Third Motion to Compel (Docs. 136-3, 136-4).

145.   Defendant has issued to its employees numerous employee handbooks which do not contain detailed information about the Federal False Claims Act, administrative remedies under federal and state laws for false claims and statements, whistleblower protections, or the roles of such laws in preventing

and detecting fraud, waste, and abuse in Federal health care programs. Exs. WW, XX, YY, ZZ, AAA, BBB, CCC, DDD, Employee Handbooks.

146.  LMH employees never received any education on the False Claims Act while employed by LMH. Ex. MMM, Rocha Declaration at ¶18; Ex. A, Duffy Depo. at 141:11-14; Ex. OO, Bones Depo. at 96:17-23.

**Defendant acted in concert with non-employees**

147.  Defendant contracts with a group of ED physicians, who are not LMH employees, to provide medical services to its Emergency Department. Ex. F, Swisher Depo. at 197:24-198:11.

148.  Elaine Swisher discussed "CMS Core Measures. . . on the door to 12 lead EKG time" and LMH's goal of three minutes with the non-employee ED physicians. Ex. N, Depo. Ex. 64.

**"Validation" is review by CMS to ensure proper abstraction; it would not uncover false patient records.**

149.  Through a contractor, CMS performs "validations" with respect to abstracted data submitted to it by certain providers under the OQR program, including Defendant. Specifically, the purpose of validation is to validate that LMH "abstracted the chart correctly." [Ex. NNN, 12/06/13 email].

## IV.  SUMMARY JUDGMENT STANDARDS

### A.  Overview

In response to Defendant's iteration of the standards applicable to summary judgment, Relator contends that Defendant has not met its burden

under Rule 56(a)[3] to affirmatively show that there are no genuine disputes as to any material fact. Further, because discovery is far from complete the Court should defer a ruling on the Motion using its power under Rule 56(d).

### 1. <u>Rule 56(a)</u>

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Veile v. Morrison,* 258 F.3d 1180, 1184 (10th Cir. 2001); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). Under this standard, the court views the evidence and draws reasonable inferences in the light most favorable to the non-movant. *Seifert v. Unified Gov't of Wyandotte County,* 779 F.3d 1141, 1150 (10th Cir. 2015).

A fact is material under this standard if a dispute over it would affect the outcome of the suit. *Green v. Harbor Freight Tools USA, Inc.,* No. 09-2380 2013 WL 4504316 *1 (D. Kan. Aug. 23, 2013), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue is genuine only if it "is such that a reasonable jury could return a verdict for the nonmoving party." *Green* at *1, quoting *Liberty Lobby, Inc.* at 248.

Credibility determinations and weighing of the evidence are jury functions and are not for the court. *Liberty Lobby, Inc.* at 255; *Tolan v. Cotton*, 134 S.Ct.

---

[3]   Relator notes that the motion is to be evaluated under Rule 56(a). With the 2010 amendments to the Rule, the applicable standard is stated in subsection (a), not in subsection (c) as stated by the Defendant (Doc. 152 at 24). Also, with the 2010 Amendments, the test in part is not, "when there is no genuine issue of material fact" as stated by the Defendant (Doc. 152 at 24), but is whether "there is no genuine dispute as to any material fact." See, Rule 56(a). However, the Advisory Committee Notes for the 2010 Amendments make clear that, "The standard for granting summary judgment remains unchanged."

1861, 1867 (2014) (lower court improperly weighed evidence and resolved disputed issues in favor of moving party; summary judgment vacated). In the event that the Court decides there is no genuine issue of disputed fact, it must apply the correct substantive law to determine whether judgment is appropriate. *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1197 (10th Cir. 2006).

## 2. Rule 56(d)

Fed. R. Civ. P. 56(d) provides, "If a non-movant shows by affidavit or declaration that it cannot present facts essential to justify its opposition, the court may: 1) defer considering the motion or deny it; 2) allow time to obtain affidavits or declarations or to take discovery; or 3) issue any appropriate order."

This provision should be applied with a spirit of liberality to prevent injustice to the party facing summary judgment. *Gofron v. Picsel Technologies, Inc.,* 804 F.Supp.2d 1030, 1036 (N.D. Cal. 2011), citing, 10B Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, <u>Federal Practice and Procedure</u> 3d ed., § 2740 p. 402 (1998). A party seeking deferral of the ruling on summary judgment must state with specificity how the additional material will rebut the motion. *Garcia v. United States Air Force*, 533 F.3d 1170, 1179 (10th Cir. 2008).

The Third Amended Scheduling Order set a discovery deadline of October 6, 2017. (Doc. 4 at 4). Relator anticipates needing that full allotment of time.[4] Relator refers the Court to the declaration of counsel which summarizes the discovery completed to date as well as the additional discovery needed in this

---

[4] Relator has filed a motion to modify the Third Amended Scheduling Order (Doc 160), which remains pending with the Court.

case. Ex. LLL. Relator also refers the Court to the Declaration of Daniel S. Levy
which further explains the necessity of the discovery yet to be produced by
Defendant. Ex. OOO. As noted, there are many  important discovery issues that
must be resolved before consideration of summary judgment would be
appropriate.

V.      **ARGUMENT AND AUTHORITIES**

A.  **LMH is Not Entitled to Judgment as a Matter of Law Regarding
    Relator's Claim That Delaying Documentation of a Patient's Arrival
    until After Administering an EKG Caused the Submission of
    Numerous False Claims.**

1.  **LMH's Conduct and Practices Violate CMS' Explicit Definition of
    "Arrival Time."**

There are two fundamental requirements set forth by the CMS
Specifications Manual for determining "arrival time" of Emergency Department
patients, both of which must be followed, as recognized by Defendant in the
exhibits attached to Ava Trahan's Affidavit (Defendant's Exhibit F, Doc.152-6),
comprising the CMS Specifications Manual and updates since 2010.

a.  **"All medical record entries must be legible and must be timed,
    dated and authenticated (42 CFR 482.24(c)(1))."**[5]

All patient medical record entries must be timed, dated, and
authenticated. 42 CFR 482.24(c)(1). This means that every one of the
items/events in each patient's Emergency Department record must, as a matter
of law, have the associated time and date recorded and authenticated. This
applies to everything in the patient Emergency Department record, whether that

---

[5]   See opening sentence of Defendant's Exhibit F-2 (Doc. 152-8).

is the time on a triage note, form or record; the time on an ED consent to treat form; the time on an ED outpatient registration/sign-in form; the time on ED physician orders; the time of ECG reports; the time of patient registration; the time of telemetry/rhythm strips; the time of laboratory reports; or the time of x-ray reports.

> **b.** "**The Emergency Department record includes any documentation from the time period that the patient was an [ED] patient — e.g. ED face sheet, ED consent/Authorization for treatment forms, ED/Outpatient Registration/sign-in forms, triage record, ED physician orders, ECG reports, telemetry/rhythm strips, laboratory reports, x-ray reports.[6]**

The items listed above are deemed by the Specifications Manual to be "Acceptable Sources" for determining patient arrival time. And when the times for each are recorded and authenticated, the earliest of those times in the patient record is then to be abstracted as the patient's "arrival time." SOF ¶¶85, 88, 89.

If the ECG/EKG time is the earliest time in the patient's Emergency Department record, after all of the other events in that record having a recorded time have been authenticated, then the hospital, including Defendant, is allowed to report the ECG/EKG time as the time of that patient's arrival.

But, if times or events that are required to be recorded in the patient record are omitted, falsified or destroyed to make the ECG/EKG time appear to be the first event in the patient record, then that **patient record is false**, the requirement of 42 CFR 482.24(c)(1) (cited in the Specifications Manual) that all

---

[6]   See highlighted section of Defendant's Exhibit F (Doc. 152-6), page 24.

documentation must be timed and authenticated is not met, and the ECG/EKG

time cannot truthfully be reported as the patient's arrival time.

Similarly, if any times, events or records are altered, deleted, destroyed or

concealed, that **patient record is false**, the requirement of 42 CFR 482.24(c)(1) is

not met, and reporting the ECG/EKG time as the patient's arrival time is false.

> c. **Both "a" and "b" above must be followed exactly to create a record that is lawfully authenticated, truthful, accurate and complete, and the facts demonstrate LMH's Conduct and Practices Violate CMS' Explicit Definition of "Arrival Time."**

As shown in the Statement of Facts, LMH instructed its nurses and staff

to delay registration (QTR) until after EKG in order to achieve maximum

reimbursement. SOF ¶¶126-129. Triage was mischaracterized as a nursing

assessment, because a triage note would be an earlier recorded event than an

EKG. SOF ¶94. LMH made a concerted decision to not report time that elapsed

between a patient's physical arrival in the ED and the time of EKG for chest

pain patients. SOF ¶¶96-136. The EKG time automatically generated by the

monitor is the time printed when the EKG is complete, not when the EKG

begins, nor when any of the steps to begin an EKG begin. SOF ¶123.

It is impossible for LMH to "assess" whether an EKG is necessary without

first making contact with the patient and asking basic questions – like why are

you here? The events necessarily preceding EKG must be, but are not,

documented. This renders the patient record false.

> 2. **LMH's Directive to document the EKG first, and not include any documentation from the time that a patient was in the ED until the EKG has been completed, is an objectively false claim or statement**

in the patient's record.

Defendant reported a median arrival-to EKG time of **zero** minutes for many reporting periods. SOF ¶¶130, 133. But Relator does not rely merely on the facial absurdity of that number. Defendant's practices were specifically designed to produce the "zero" result, in order to cheat Medicare. SOF ¶¶127, 128.

While the Specifications Manual includes an EKG as one of the acceptable data sources to report arrival time, LMH policy and directives mandate the EKG as the **exclusive data source**. LMH altered, deleted, destroyed or concealed records that would have shown an earlier documented time in the record. ED Face sheet originals were destroyed (SOF ¶109), as were "triage sheets" and "cheat sheets" - parts of the Emergency Department Record on which critical patient information was written. SOF ¶¶105, 109, 111. "Interim forms," on which a patient or family member recorded information, were also destroyed SOF ¶99, 100.

Defendant mocks Relator's testimony as "her own definition" of "arrival time." Relator testified that to her, "arrival time" was the earliest time at which a patient seeking medical care reaches the triage desk and could reasonably be entered into the computer. SOF ¶11. She also stated, "I believe that the arrival time should be the time of arrival" (SOF ¶11), a basic proposition in accord with the intent of CMS and with which Defendant now strenuously disagrees. Relator's understanding of "arrival time" is entirely consistent with the CMS

Specifications Manual. See Section 2, c., *infra.*

Defendant stipulates that triage is the process of sorting patients. SOF ¶91. This occurs at the triage desk. SOF ¶92. Both Swisher and Harvey testified that there can be up to five patients at the desk at any given time. SOF ¶90. Harvey stated that patients are sorted into three different categories. SOF ¶91. The time that triage and sorting patients by priority and urgency occurs is an event required by the Code of Federal Regulations and the Specifications Manual to be documented and authenticated. 42 CFR 482.24(c)(1); SOF ¶82, 87-89. Determining whether a patient has chest pain is a triage process which takes time. Harvey testified that not every chest pain patient is a 'straight back, Jack' and that the nurse has to make professional judgments at triage SOF ¶93. It defies logic to believe that assessing whether chest pain may be more likely related to coughing from bronchitis than to acute myocardial infarction takes zero minutes.

Once assessed to be a patient at risk of having a heart attack, the urgency in obtaining an EKG under Defendant's "Straight back, Jack" policy, ahead of all less urgent patients, is good clinical care. But this case is not about prioritizing chest pain patients for treatment. This case is about falsifying arrival times for patients who present with chest pain.

Former LMH nurse Jeanine McCullough-Baze testified about the time that elapses between triage for a "straight back, Jack" patient and the time the EKG is actually completed with its automatically generated time. SOF ¶123.

This process involves getting the patient to a room within the ED, locating an EKG monitor if one is not physically present in the room, sometimes charging the EKG monitor, removing the patient's shirt, and perhaps the bra of a female patient. It involves measuring the precise locations for the 12-leads of the EKG to be placed on the patient, and sometimes shaving the locations where the leads will be placed. It then involves running the EKG, which sometimes must occur more than once. Defendant's manipulation of the record so as to make it appear that no such time elapsed means it has falsified the arrival time for chest pain patients.

LMH manager Elaine Swisher's testimony confuses these events with language of a "dance" and of the events being choreographed to all occur simultaneously SOF ¶43. But her testimony disregards the reality of what was actually happening. Triage is the process of sorting patients, while an EKG is the process of administering an electrocardiogram to determine if a heart attack has occurred, and these separate events do not, did not, and actually cannot happen simultaneously.

McCullough-Baze testified that Swisher directed her and other nurses to shorten times in the patient records of chest pain patients and to change the triage times she had previously recorded to match the automatically generated time of the EKG. SOF ¶121. The fact that triage in all of those cases chronologically had preceded the EKGs by a matter of minutes is corroborated by simulations that Defendant's staff ran in preparation for the October 2010

reimbursement changes that showed, even after streamlining everything possible, they could not reduce the time between triage and the EKG to less than four minutes without "kind of cheating". SOF ¶ 132, 127.

 Defendant mistakenly argues that McCullough-Baze's practice of recording triage as three minutes before the time of the EKG means that Defendant did not falsely report triage and arrival times. Defendant's argument ignores McCullough-Baze's testimony that Defendant directed nurses to make the triage and EKG times match exactly and that other nurses followed the directives. SOF ¶¶121, 124.

Separately, when registration did not occur after the EKG, registration times were changed to appear that they had occurred either at the time of the EKG or shortly thereafter.

Defendant's Admissions Manager, Brenda Bones, testified that admissions representatives were directed to register chest pain patients differently than other patients. SOF ¶126. Bones testified that sometimes some of the admissions reps would "get ahead of themselves," registering a patient before the EKG. SOF ¶136. She also testified that one could change the time of registration in a patient's record SOF ¶113.

Former LMH Admissions Representative, Crystal Rocha, states that she witnessed Defendant changing patient records to falsely show that EKG was done within a few minutes of registration, or at the same time. SOF ¶114-117. Ms. Bones told Ms. Rocha she would get in trouble if registration was not

delayed until after EKG, because Defendant wouldn't get paid by Medicare. SOF ¶116. Ms. Rocha states that Defendant would sometimes change patient registration times in patient records. SOF ¶117.

Finally, former LMH Admissions representative, Christine Neibarger, wrote an email to LMH CEO, Gene Meyer, confirming to him that the allegations in Relator's Second Amended Complaint regarding falsified arrival times were true. SOF ¶125.

Contrary to Defendant's assertions, the "EKG first" policy did compromise patient care. ED physician orders could not exist until a patient was registered. Laboratory work, x-rays, other procedures and prescriptions requiring a physician order could not occur until after a patient was registered. SOF ¶¶130, 131.

When patient records of events are altered to match or follow the time of the EKG, and registration records are altered to match or follow the time of the EKG, the EKG time falsely becomes the "earliest" time in the patient record. It is then abstracted and reported to CMS as the patient's arrival time for metrics used in determining reimbursement from Medicare, all in violation of the Specifications Manual and the CFR.

### a. "Validation" of Defendant's submissions of patient data to CMS might reveal incorrect abstraction practices, but would not reveal false recording of patient events.

Defendant states that its data submitted for IQR and OQR reports have been "validated" on at least three occasions, suggesting that all of the

information submitted to CMS is accurate.

Validation is merely a process that involves a CMS-selected hospital sending a sample of records that were already reported to a third-party CMS contractor for review. SOF ¶149. The third party contractor reviews that sample of records to evaluate and compare to the records that were uploaded and reported by the hospital to CMS, and to determine if the chart was abstracted correctly. SOF ¶149. Five hundred randomly selected hospitals or providers are chosen for validation in a particular year, and the validation request may be for as few as twelve records. The hospital then has an opportunity to make sure the records are complete and that their abstraction can be found in the record before mailing it to the contractor. SOF ¶149.

The OQR program entails all of the outpatient measures that the hospital abstracts, including door-to-ECG, AMI measures, time of arrival until being seen by a physician, time of arrival until troponin levels are tested, etc., including the time of arrival until time of discharge. 42 CFR 419.46; 42 U.S.C. § 1395l(t)(17). The contractor usually selects 1-2 charts from each category. Ex. NN; SOF ¶149.

Failing the validation places at risk the market basket increase the hospital receives each year. 42 CFR 419.46; 42 U.S.C. § 1395l(t)(17). Ava Trahan stated that if they fail at any of the items they have to do for compliance with the IQR and OQR, it jeopardizes these dollars, which total 2% of the hospital's market basket increase. Ex. NN; SOF ¶149.

The "validating" contractor is looking for proper abstracting from a small

sample of patient records. It is not examining the underlying patient records for accuracy. Validation is not an actual audit. No onsite reviews are conducted. No employees are interviewed about the processes followed in documenting the times recorded in the patient record, or if the charts accurately reflect the real times that should have been recorded in the patient record. And no inquiry is performed to determine if the patient record that is being "validated" is truthful and accurate. Instead, the record is taken at face value, pursuant to the Specifications Manuals, with the presumption that everything in the record is truthful based upon the Data Accuracy and Completeness Acknowledgement form the provider has already signed and submitted regarding the records in question. Validation looks solely at whether or not the record was correctly abstracted.

Relator summarized Defendant's scheme as "garbage in, garbage out," meaning abstracted data is no more or less accurate than the underlying patient records. Validation is performed only on the "garbage out." It is not designed or intended to uncover the "garbage in," which is where the falsity is in this case.

This validation process, as a result, does nothing to absolve Defendant of liability under the FCA when it manufactures false times within the patient record. Validation does not negate the *scienter* of the Defendant.

### b. LMH failed to disclose "all pertinent information" and thus, the defense of "government knowledge" does not apply.

Defendant did not disclose "all pertinent facts," including the false times recorded in the patient records that were abstracted, or the process of omitting

or changing times in the record, to the government or even to the government's third-party contractor performing the validation. Because the times are knowingly false, the "government knowledge" defense cannot apply.[7]

The "government knowledge" defense is only relevant in two situations: (1) where it establishes that the contractor did not "knowingly" submit false claims because the contractor candidly disclosed to the government the defects later alleged to give rise to false claims; or (2) where the government was fully apprised of the underlying circumstances surrounding the submission of the claim. *See e.g., United States ex rel. Lamers v. Green Bay*, 998 F. Supp. 971 (E.D. Wis. 1998); *United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412 (9th Cir. 1992); *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321 (9th Cir. 1995).

The government's knowledge cannot negate the defendant's intent to knowingly submit false claims where the defendant fails to disclose "all the pertinent information" that renders its claim false. *United States ex rel A+ Homecare, Inc. v. Medshares Mgmt. Group*, 400 F.3d 428, 454 n.21 (6th Cir. 2005); *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (requiring disclosure of "all the underlying facts"). *See also Massachusetts v. Mylan Labs.*, 608 F. Supp. 2d 127, 149 (D. Mass. 2008);

---

[7]     The prior government knowledge defense was legislatively repealed (via the 1986 amendments to the FCA) as an affirmative defense to qui tam actions in which the government does not intervene.  Although government knowledge is not a true affirmative defense in an FCA case, as it does not completely defeat such claims, full and accurate disclosure of information to the government by the contractor concerning the performance of a contract has been recognized by some courts as relevant to the contractor's subjective state of mind in submitting its claims or to the objective "falsity" of the claim. *See United Stats ex rel Burblaw v. Orenduff*, 548 F.3d 931, 951-53 (10th Cir. 2008) (discussing cases).

*United States v. Bald Eagle Realty*, 1 F. Supp. 2d 1311, 1316 (D. Utah 1998) (question of negated intent does not arise where defendants failed to disclose information to government.

Defendant has never at any time disclosed to CMS "all pertinent information" related to its false arrival times, its practice of altering triage times and registration times, and its omission of other information and events that are required to be recorded and timed. LMH has never disclosed how it is using this practice to submit false claims under the Medicare reimbursement programs (HVBP, IQR or OQR) with the intent of increasing reimbursement from the government or receiving "maximum reimbursement from CMS." Even to this day, Defendant continues to deny all of the allegations in this lawsuit, calling them baseless and false. Nor has Defendant at any time disclosed to CMS or KanCare agents acting on behalf of CMS and Medicaid that its FCA Education materials were not compliant with the statute and with what LMH attested to as a condition of receiving more than $5 million from Medicaid in any federal fiscal year. Accordingly, the "government knowledge" defense does not apply in this case.

### c.  <u>No "Reasonable Interpretation of the Statute" defense applies</u>[8]

---

[8]   There is no "reasonable interpretation of the Statute" defense anywhere in the FCA, and the concept itself is completely counter to Congress' expressly stated intent when it amended the statute in 1986 to remove the "specific intent to defraud" language from the statute and to instead replace it with a "knowing" standard that includes "actual knowledge," "deliberate ignorance of the truth or falsity of the information," or "reckless disregard for the truth or falsity of the information."

Defendant contends that it reasonably interpreted "arrival time" in accordance with the CMS Specifications Manual and is therefore not liable for any FCA violations, citing *U.S. ex rel. Hixson v. Health Management Systems, Inc.,* 613 F.3d 1186, 1191 (8th Cir. 2010).

Defendant had a duty to make at least basic inquiries with CMS if there was any confusion about a statutory, regulatory or contractual requirement.[9] A defendant cannot merely claim that whatever its interpretation of the statute was constitutes a "reasonable interpretation of the statute." Instead, when the meaning of the law is clear, a defendant cannot merely claim that it acted in good faith by interpreting the law in a supposedly "reasonable," yet alternative manner – because there is no ambiguity that makes the defendant's interpretation reasonable. *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463-64 (9th Cir. 1999). If a Defendant cannot identify an ambiguity, the "reasonable interpretation of the statute" defense does not apply, even in circuits where it has been recognized. And the *Hixson* case, which LMH cites, involves

---

[9] In 1986, when it adopted the "reckless disregard" standard, Congress understood that defendants would have a limited duty to make a simple inquiry to confirm that their interpretation was correct. According to a Senate Report, the FCA's knowledge standard reaches the "ostrich" situation "where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." (S. Rep. No. 99-345, at 21, reprinted in 1986 U.S.C.C.A.N. 5266, 5286 (1986). See also *id.* at 6-7, reprinted in 1986 U.S.C.C.A.N. at 5271-72.). A House Report additionally explains that: "By adopting this definition of knowledge, the committee intends not only to cover those individuals who file a claim with actual knowledge that the information is false, but also to confer liability upon those individuals who deliberately ignore or act in reckless disregard of the falsity of the information contained in the claim. It is intended that persons who ignore "red flags" that the information may be accurate or those persons who deliberately choose to remain ignorant of the process through which their company handles a claim should be held liable under the Act. This definition, therefore, enables the Government not only to effectively prosecute those persons who have actual knowledge, but also those who play 'ostrich.'" (H.R. Rep. No. 99-660, at 21 (1986)).

the interpretation of an ambiguous statutory requirement, unlike this case. Here, there is no ambiguity with respect to "arrival time" or how it is determined.

Even if there were an ambiguity, the court is then to look at administrative interpretations and determine whether such interpretations are based on a permissible construction of the statute or regulation. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). Here, the administrative definition of "arrival time" is contrary to LMH's interpretation, making it unreasonable. SOF ¶¶82-89¶2; CFR 482.24(c)(1). And even if a defendant's interpretation is found to be reasonable, a jury is to decide whether sufficient evidence has been submitted that would have "warned away" the defendant from its interpretation. *See Purcell v. MWI Corp.*, 807 F.3d 281, 289 (D.C. Cir. 2015) (citing *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007), petition for rehearing en banc filed, Nos. 14-5210, 14-5218 (D.C. Cir. Jan. 1, 2016), petition denied, No. 15-5210 per curiam) (D.C. Cir. June 21, 2016)); *See also United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053 (8th Cir.) ("If the Association shows that defendants certified compliance with the regulation knowing that the HCFA interpreted the regulations in a certain way and that their actions did not satisfy the requirements of the regulation as the HCFA interpreted it, any possible ambiguity of the regulations is water under the bridge."), cert. denied, 537 U.S. 944 (2002). *Accord United States ex rel. Chilcott v. KBR, Inc.*, No. 09-cv-4018,

2013 U.S. Dist. LEXIS 153331, at 22 (C.D. Ill. Oct. 25, 2013) ("While it is true that an innocent misinterpretation or a disputed interpretation of a contract cannot, standing alone, support a FCA claim, a deliberate or knowing misinterpretation, even if "reasonable," can give rise to FCA liability.").

And even the Eighth Circuit that gave us the *Hixson* decision has recognized that a duty to inquire is clearly an issue for the ultimate fact-finder. (*United States v. Takea Extrusions, LP*, 341 F.3d 843, 845 n.2 (8th Cir. 2003) (citing *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 768 (8th Cir. 2002); *United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.* 276 F.3d 1032, 1053 (8th Cir. 2002)). *See also Heckler v. Community Health Servs.,* 467 U.S. 51, 64 (1984) (participant in Medicare program "had a duty to familiarize itself with the legal requirements for cost reimbursement" and to seek clarification by the agency of ambiguities in interpreting regulations).

The Federal Central District of Illinois addressed the reasonableness of a contractor's interpretation of a contract provision. *United States v. Kellogg Brown and Root Servs.,* 2014 WL 1282275, at *7-9 (C.D. Ill. Mar. 31, 2014). Just because reasonable minds may disagree over the interpretation of a contract term does not shield one from knowledge of falsity for FCA purposes. *Id.* at *7. In other words, reasonableness is relevant to the issue of falsity, but it does not conclusively negate knowledge under the FCA. *Id.* (citing *United States ex rel. Chilcott v. KBR, Inc.*, 2013 WL 5781660, at *6 (C.D. Ill. Oct. 25, 2013) (citing

*United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999)).

Thus, even if one has an objectively reasonable interpretation, falsity can still be shown if that person is cognizant of facts that undermine the basis for that interpretation. *Id.* (citing *United States ex rel. Yannacopoulos v. General Dynamics,* 652 F.3d 818, 833 (7th Cir. 2011)). Allowing a defendant to escape FCA liability by the bare assertion of a "reasonable interpretation," without a showing of good faith, would permit such defendants "to avoid liability by offering a post-hoc 'reasonable' interpretation of the contract, with no evaluation of whether that interpretation was chosen with knowledge, willful ignorance, or reckless disregard of whether it was the correct interpretation." *United States v. Kellogg Brown & Root Servs.*, 2014 WL 1282275, at *9 (citing *United States ex rel. Chilcott v. KBR, Inc.*, 2013 WL 5781660, at *8 (C.D. Ill. Oct. 25, 2013)).

As initially framed in the *Hixson* case, the burden is placed on the relator to "show that there is no reasonable interpretation of the law that would make the allegedly false statement true." *U.S. ex rel. Hixson*, 613 F.3d at 1191. As noted in *Chilcott*, such a rule places an impossible burden on drafters of statutes, regulations, and contracts to avoid any ambiguity whatsoever so that FCA defendants could never arrive at self-serving interpretations of the text to avoid liability. Such an analysis is not supported by the FCA statutory language, underlying purpose, or legislative history. Instead, as Congress envisioned, the burden should be on the defendant to demonstrate that it reasonably arrived at its interpretations of the statutes, regulations, and or contract terms at issue.

And where a defendant asserts its own confusion or lack of understanding, but took no steps to obtain clarification from the appropriate agency, such defendant's interpretation was not "reasonable."

### 3. LMH made a "knowingly" false statement to CMS

To prevail at trial, Relator must show LMH "knowingly" presented a false claim to CMS or "knowingly" utilized the false statement for payment or approval. *U.S. ex rel. Burlbaw v. Orenduff*, 548 F. 3d 931, 945 (10th Cir. 2008). Although "no proof of specific intent to defraud" is required, a Relator must at least show that the defendant acted with "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1) (defining "knowingly" as acting with "actual knowledge of the information," or with "deliberate ignorance ... or ... reckless disregard of the truth or falsity of the information."); *see also* fn 8, *supra*.

Defendant argues that there are merely "conflicting opinions" as to the meaning of the law in this case. Accordingly, Defendant asks the Court to juxtapose a hospital's opinion on the law against a nurse's opinion on the law, find them in conflict, and call it a wash. What this argument misses is that neither opinion matters. Relator asserts that LMH knowingly falsified patient records, and presents extensive evidence of the same. Defendant's denials at best amount to factual disputes for a jury.

The only conflict is between Defendant's conduct and the law. The facts demonstrate systematic manipulation and falsification of patient records in

order to increase or "maximize" Medicare reimbursements. The facts do not leave a jury to guess at Defendant's state of mind here. Defendant repeatedly trained its employees to falsify patient records and consistently gave "Medicare reimbursement" as the reason and motivation behind these policies and procedures.

Defendant also suggests, without support, that its policies were "condoned by CMS itself" (Doc 152 at 31). Although it is not clear what Defendant relies upon for this assertion, CMS made clear to Defendant its intention that Defendant accurately record processes that occurred in the Emergency Department so as to truthfully and accurately abstract for the "arrival time" metric. SOF ¶¶82-89. Defendant seems to suggest that, because EKG times fall among the many types of documentation that might honestly be the first timed event in the patient record, it is entitled to systematically *ensure* that no remnant of earlier events is appears in the record. This is gaming the system. It is false and it is most certainly not "condoned" by CMS.

Defendant's assertion that Relator cannot identify abstractors who submitted arrival time data is both false and odd. Relator served an interrogatory directed at that very list of names. Defendant eventually answered it. It is attached to this document and cited above. SOF ¶50.

Defendant's "knowing" scheme is evidenced by more than "nine communications from two employees who had no role in submitting Medicare claim." See SOF ¶¶11, 30, 35, 121, 127, 128, 129. The evidence shows that

obtaining "0-minute" "door-to-EKG" times directly resulted in maximum reimbursement from CMS on the claims submitted by LMH. *Id.* Relator has requested the specific pieces of evidence to show this "paper-trail," all of which are the subject of discovery disputes and will show LMH knowingly presented false claims for payment or approval. Ex. LLL.

### B. Relator is Baffled By Why Defendant Seeks Judgment as a Matter of Law as to Relator's Claim That the "Chest Pain Audit" Caused Unspecified False Claims.

Relator has not alleged that the Chest Pain Audit chart was ever submitted to the Government, either as a claim for payment or in support of a claim for payment. The significance of the Chest Pain Audit (Defendant's Ex. I, Doc. 152-14) is to corroborate Relator's and other witnesses' testimony that Defendant directed its employees to change triage times recorded in patient records to match the time of the EKG.

The Chest Pain Audit tracked by medical record number which chest pain patients' records showed triage times that did not exactly match the time automatically generated by the EKG monitor. Relator testified that if the times did not match, the associated triage nurse would get in trouble. SOF ¶61. Relator also testified that subsequently changing the triage time in a patient's record caused the record to be false. SOF ¶61. This is evidence that LMH knowingly created false data, which was then abstracted and submitted to CMS to support HVBP performance measures and IQR/OQR reported measures which translated into enhanced reimbursements from the government. Again, this was

the process of entering false data in the patient record (garbage in) which was then abstracted and submitted to CMS (garbage out).

Swisher's innocuous explanation as to the purpose of the Chest Pain Audit not only creates credibility problems for Swisher as her explanation directly contradicts Swisher's own written "weekly notes" to her staff (SOF ¶128) but it also creates a genuine issue of material fact that must be resolved by a jury, and cannot be resolved through a Motion for Summary Judgment.

## C. Duffy Can Show That LMH Made False Claims Material to Payment From the Federal Government.

Defendant contends there is no evidence that any falsity in a claim was material to the payment, and focuses only on implied false certifications and government knowledge of the alleged fraud. Neither argument is dispositive.

There are three different types of false claims: (1) factually false claims; (2) express legally false certification claims; and (3) implied legally false certification claims. A different "materiality" standard applies to each.

A payee makes a **factually false claim** by either (1) submitting an incorrect description of the goods or services provided; or (2) requesting reimbursement for goods or services not provided. *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008).

A payee makes a **legally false claim** by certifying compliance with a statute or regulation as a condition to government payment but knowingly failing to comply with that statute or regulation. *Id.* **Express false certification** occurs when a government contractor falsely certifies compliance with a

particular statute, regulation, or contract term and compliance is a prerequisite to payment. *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F. 3d 1163, 1168 (10th Cir. 2010). **Implied false certification** occurs when a government contractor doesn't expressly certify compliance, but knowingly and falsely implies that it is entitled to payment when it submits a claim. *Id.* at 1169; see also *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010), cert denied, 131 S.Ct. 801 (2010).

The Supreme Court has observed that the FCA "reaches beyond 'claims' which might legally be enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968); see also *United States ex rel Scwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995) ("Each individual false claim or statement triggers the statute's civil penalty."). The civil penalty is determined by counting "[e]ach individual false claim or statement . . ." *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995).

Defendant cites *Universal Health Services, Inc. v. U.S. ex rel. Escobar*, 579 U.S. ___, 136 S.Ct. 1989 (2016)[10] as authority for its materiality argument.

---

[10] In *Escobar*, the plaintiffs alleged that a healthcare provider submitted reimbursement claims for counseling and other mental health services but failed to disclose material violations of regulations governing professionals' qualifications and licensing requirements. The Supreme Court addressed two issues—liability and materiality. First, the Court held that implied certification theory can be a basis for liability where at least two conditions are met: (i) the claim for payment makes specific representations about the goods or services provided, and (ii) the party's failure to disclose non-compliance with material statutory, regulatory or contractual requirements makes those representations misleading half-truths. Second, the Court explained that the FCA's materiality standard looks to whether knowledge of the noncompliance would have actually affected the government's payment decision, not just whether it could have done so.

*Escobar* only addresses "materiality" with regard to implied certification claims. *Escobar* does not apply to factually false claims or express false certification claims.

While Relator is waiting on documents that have been the subject of discovery requests and disputes for months, Relator can still show that LMH made false claims material to the government's decision to pay. Here, the facts support each of three different types of false claims.

### 1.  Factually false claims

The false arrival times were material because they influenced the Medicare claims for payment or reimbursement under either pay-for-reporting programs or pay-for-performance (Value Based Purchasing). These are objectively and factually false claims for payment.

The patient records with false arrival times and other timed measures were objectively/factually false. These were "harvested" and reported to CMS on a quarterly basis. SOF ¶81. Thus, the false patient records that comprised each harvest to CMS were objectively/factually false.

The Data Accuracy and Completeness Acknowledgment forms, which certified that the patient records sent to CMS were accurate and complete, are factually false claims, with one signed and submitted each year since October 2010. SOF ¶77.

Each quarterly "harvest" of IQR and OQR patient data is a factually false claim, with one of each submitted each quarter since the fourth quarter of 2010.

31 U.S.C. 3729(a)(1)(B). Not only did LMH report "knowingly" false information under both of these pay-for-reporting programs, but these were the basis for tracking and reporting HVBP measures such as AMI-7a and 8a. Those performance measures were based on false data that was reported to CMS to determine LMH's Total Performance Score and how much it would receive from the annual hold-back plus the maximum HVBP bonus LMH got each year. SOF ¶¶49, 74.

The quarterly harvests may be deemed a false claim as an act or communication to influence the government's decision to pay, under *Neifert-White Co.*, 390 U.S. at 233 (1968). The patient records underlying the harvests are also knowingly and objectively false, and therefore False Claims.

When false arrival times are recorded in the patient record, including through omission or altering of triage times, and those false arrival times in the patient record are then abstracted and reported to CMS, that fraud infects all reimbursement connected to those false reports. Not only is OP-5 (Median Time to ECG) false in the OQR, but so are each of the other timed quality measures that are tracked and based upon patient arrival time. These measures include but are not limited to, Median to ECG time, fibrinolytics within 30 minutes of hospital arrival, primary percutaneous coronary intervention within 90 minutes of hospital arrival, Troponin results for emergency department acute myocardial infarction (AMI) patients or chest pain patients (with probably cardiac pain) received within 60 minutes of arrival, time of arrival to diagnostic evaluation by

a qualified medical professional, median time from ED arrival to ED departure for admitted patients, and median time from ED arrival to ED departure for discharged patients. *See* Ex. PPP, CMS Quality Measures Dashboard.

Payments on each individual Medicare claim rendered false by false IQR and OQR reporting is *not* an implied false certification. They are, instead, "factually false" claims for payment because a portion of each contains payment for goods and services not actually rendered, namely, reporting accurately and completely under the pay-for-performance program, and failing to actually achieve the times reported on IQR and OQR for HVBP pay-for-performance.

### 2.  Express false certification

The "express false certification" is the Attestation of Compliance with Section 6032 of the Deficit Reduction Act of 2005, which LMH attested to each year. SOF ¶77. The Attestation expressly certifies compliance with a statute, regulation or contract upon which payment is premised. That statute is Section 6032 of the Deficit Reduction Act, and the attestation expressly states to the signer that payment in excess of $5 million from Medicaid per federal fiscal year is predicated upon signing and complying with the requirements set forth on that form. LMH was not eligible to receive those payments from Medicaid because they were in violation of Section 6032 of the Deficit Reduction Act (42 U.S.C. 1396a(a)(68)). Accordingly, each claim for payment submitted to Medicaid in those years was false. And each "knowingly false" attestation is subject to civil fines even without damages.

### 3.  Implied false certification

The "implied false certification" claims that are affected by *Escobar* in this case are the claims for payment LMH sends to Medicaid in any federal fiscal year after LMH has hit the $5 million dollar cap for Medicaid providers not complying with the FCA Education requirement.

### 4.  Government "acquiescence" is no defense

Defendant argues what LMH reported was not material because CMS had full knowledge of Duffy's fraud allegations through the NCI AdvancedMed investigation and it never penalized LMH. This argument is flawed for several reasons.

First, NCI AdvanceMed is not CMS but merely a third party contractor for CMS.

Second, NCI investigated the wrong thing. NCI narrowed its investigation strictly to whether or not door-to-ECG time was a quality measure of HVBP. Defendant's Ex. L (Doc 152-17). It stopped its investigation without ever looking at the issue of falsified arrival times, and without looking at the issue of fraud under the OQR reporting program. It never talked to a single LMH employee to ascertain if triage records and registration records were being falsified to appear to have occurred only at the time of the EKG or afterward, or if any other steps were being taken to falsify the arrival times of patients. It simply stopped at the profoundly preliminary step of determining that door-to-ECG time was not a quality measure tracked for HVBP purposes. By suspending

its investigation prematurely it never investigated the truth or falsity of the claim that door-to-EKG times were being falsified, or that other measures, including time of triage and of registration were also being falsified. The incomplete knowledge of a third-party contractor cannot be imputed to CMS, nor to what CMS deems material to a payment, nor to CMS' actual decision to pay.

Third, Government approval is more than acquiescence. Mere acquiescence, rather than actual approval, is not sufficient to avoid liability, as this "would preclude FCA liability any time a government employee and a defendant were in cahoots." *United States ex rel Tyson v. Amerigroup Ill.*, 488 F.Supp 2d 719, 730 (N.D. Ill. 2007) (citing *United States ex rel. Asch v. Teller, Levit & Silvertrust, P.C.,* 2004 U.S. Dist. LEXIS 8220, at *9 (N.D. Ill. May 7, 2004)). See also *Varljen v. Cleveland Gear Co.,* 250 F.3d 426, 430 (6th Cir. 2001); *City of N.Y. Abbott Labs.,* 685 F.Supp. 2d 186, 205-07 (D. Mass. 2010) (showing of full disclosure and government approval required). It is not merely government knowledge of falsity that precludes an FCA claim, but government encouragement and involvement in the submission of those claims. *United States v. Menominee Tribal Enters*, 601 F. Supp. 2d 1061, 1074 (E.D. Wis. 2009).

Government officials cannot authorize submission of claims based on false information and it is simply not a defense to an FCA scheme that the government continued to pay false claims even after becoming aware of the fraud. *United States v. Incorporated Village of Island Park*, 888 F. Supp. 419, 442 (E.D.N.Y. 1995); s*ee also United States ex rel. Harrison v. Westinghouse*

*Savannah River Co.*, 352 F.3d 908, 916 (4th Cir. 2003) (fact that government entity continues funding contract despite earlier wrongdoing by contractor will not defeat FCA); *United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 683 (5th Cir. 2002), *aff'd on other grounds*, 326 F.3d 669 (5th Cir. 2003)(en banc)(waiver should not be implied merely because government agency elects to work with defendant). "The government's inspection and acceptance of a product do not absolve a contractor from liability for fraud under the FCA." *Varljen v. Cleveland Gear Co.* 250 F.3d at 430 (6th Cir. 2001).

And, because there is more than six months before the scheduled close of discovery, the issue of whether or not CMS would have paid had it known can be resolved with a deposition of the CMS witness sought in Relator's subpoena CMS has been recently responding to.

Moreover, CMS could not legally have paid Defendants under the HVBP, IQR, and OQR programs, had it known of the falsity of the patient records, because it has no statutory authority to do so. The programs at issue, including the payment provisions, were devised by Congress. The payment provisions give no discretion to CMS pay false claims. *See* 42 U.S.C. § 1395ww(b)(3)(B)(viii)(I) and 42 U.S.C. § 1395l(t)(17). Thus, materiality is met as a matter of law in this case. Absent the false claims, CMS not only would not have, but *could* not, have paid them.

### 5. Relator's knowledge

Relator can and has identified false claims for payment that were submitted to the government, and which LMH's discovery responses evidence

73

were paid. Defendant's argument that Relator can't identify a single claim for payment that was false is both absurd and factually untrue.

Relator has shown the arrival times were false because triage and registration times were being falsified to make the EKG appear to be the arrival time of chest pain patients. Relator has shown this was the directive of LMH management. Relator has shown that false "0-minute" door-to-ECG times had been reported to CMS. She has shown the falsity of the Data Accuracy and Completeness Acknowledgement ("DACA") forms that attest to the accuracy and completeness of the information submitted for OQR and IQR purposes, which must be received in order to qualify for the 2% Market Basket Update increase under the IQR pay-for-reporting program, and the 2% Market Basket Update retention under the OQR pay-for-reporting program.

Quite the contrary to Defendant's assertion that Relator cannot identify a single false claim that was submitted and paid by the government, Relator can identify by categories *all* of the claims that were submitted and paid by Medicare since October 2010 as being false. Relator knows that Defendant, by way of those false submissions, received its full Market Basket Update for every year. Ex. DD, Hospitals Receiving Full APU; Ex. NNN, 12/06/13 email. Failure to meet *any* reporting requirement subjects a hospital to the 2% reduction. *See* Ex. QQQ, 6/27/12 Letter to E. Meyer. Similarly, every claim for payment by which HVBP payments were received from Medicare was a false claim for payment. Hospitals failing to meet the IQR requirements are not eligible to participate in the HVBP

program. 42 U.S.C. § 1395ww(o)(1)(C). Defendant was paid under HVBP. Ex. HH, 07/31/13 email.

If Defendant's reference to any specific "claim for reimbursement" is referring to the individual patient claims that are billed to CMS for Medicare reimbursement, Relator does not have those. They were requested long ago through proper discovery and Defendant refuses to provide them. Ex. LLL. These claims clearly exist, they are in Defendant's possession, and Relator knows that Defendant possesses them. These are false claims under 31 U.S.C. 3729(a)(1)(a).

### D. LMH is not entitled to Judgment as a Matter of Law on Relator's Claims of Conspiracy, "Reverse" False Claims, or False Certification of Compliance.

It is unclear why Defendant refers to these in its Motion for Summary Judgment as "alternative theories." They are most certainly not "alternative theories," but False Claims Act violations Relator clearly identified and properly pled in the Second Amended Complaint (Doc 18).

### 1. Certification of compliance with education requirements.

Defendant's assertion that it has complied with the False Claims Act education requirements of the Deficit Reduction Act[11] is utter nonsense. SOF

---

[11]   Section 6032 of the Federal Deficit Reduction Act of 2005, codified at 42 U.S.C. §1396a(a)(68) requires that, as of January 1, 2007, all healthcare providers who receive $5 million or more annually from Medicaid, as a condition of receiving Medicaid payments: **shall** (A) establish written policies for all employees of the entity (including management), and of any contractor or agent of the entity, that provide **detailed information about the False Claims Act** established under sections 3729 through 3733 of title 31, **administrative remedies for false claims** and statements established under chapter 38 of title 31, any State laws pertaining to civil or criminal penalties for false claims and statements, and whistleblower protections under such laws, with respect to the role of such laws in preventing and detecting fraud, waste, and abuse in Federal

¶¶144-146.

Defendant pretends to not be able to ascertain the very clear difference between (1) making statements in a code of conduct telling employees not to "[i]ntentionally or knowingly mak[e] false or fraudulent claims for payment or approval" and (2) actually "provid[ing] detailed information about the False Claims Act established under sections 3729 through 3733 of title 31," and all of the required information related to the administrative remedies, State laws, and whistleblower protections under these laws, etc. as specifically, expressly, and clearly set forth in Section 6032 of the Deficit Reduction Act.

Nowhere in the voluminous employee handbooks and other educational materials produced by Defendant is there material "concerning detailed information about the Federal False Claims Act", including what the Act is and what it does, its definitions of what constitutes a false claim, how to report false claims act violations to appropriate law enforcement or government agencies, the right of a whistleblower with unique information of fraud that has been committed against the United States to file a private cause of action on behalf of the United States, how to go about filing such a lawsuit, financial incentives created by Congress to encourage such lawsuits, and the statutory protections for whistleblowers under the Act. SOF ¶145. Defendant's employees never received any training on the False Claims Act. SOF ¶146.

---

healthcare programs . . . ; (B) **include as part of such written policies detailed provisions regarding the entity's policies and procedures for detecting and preventing fraud, waste, and abuse**; and (C) include in any **employee handbook** for the entity, a specific discussion of the laws described in subparagraph (A), the rights of employees to be protected as whistleblowers, and the entity's policies and procedures for detecting and preventing fraud, waste, and abuse.

Defendant cannot identify anywhere that it provides education to employees and contractors "concerning Administrative remedies for false claims and statements established under Chapter 38 of Title 31, United States Code."

Defendant cannot identify anywhere that it provides education to employees and contractors "concerning State laws pertaining to Medicaid fraud and abuse." In Kansas, these laws would include the Medicaid Fraud Control Act found in K.S.A. 21-5925 et seq. and, since the time of its enactment on April 30, 2009, the Kansas False Claims Act found in K.S.A. 75-7501 et seq.

Defendant cannot identify anywhere that it provides education to employees and contractors "concerning civil or criminal penalties for false claims and statements". These would include criminal penalties under Title 18 of the U.S. Code and in the Medicaid Fraud Control Act found in K.S.A. 21-5925, and civil penalties found in the Federal False Claims Act in 31 U.S.C. §3729(a), which are adjusted upward from time to time including through the Federal Civil Penalties Adjustment Act of 1990 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, and the civil penalties identified in the Kansas False Claims Act in K.S.A. 75-7503.

Defendant cannot identify anywhere that it provides education to employees and contractors "concerning whistleblower protections under such laws, with respect to the role of such laws in preventing and detecting fraud, waste and abuse in Federal health care programs." These whistleblower protections would specifically be the anti-retaliation provisions of the Federal

False Claims Act found in 31 U.S.C. §3730(h)(1) through (3), and of the Kansas False Claims Act found in K.S.A. 75-7506.

Nevertheless, each year since 2007 Defendant has signed, under penalty of perjury, an "Attestation of Compliance with Section 6032 of the Federal Deficit Reduction Act," which it submits to the state Medicaid agency acting on behalf of the Federal Centers for Medicare and Medicaid Services in order for Defendant to be eligible for Medicaid payments exceeding $5 million per federal fiscal year. SOF 77. The signatories to each Attestation, including CEO Gene Meyer, and later Vice President & CFO Joseph Pedley, are identified by Relator as the individuals who made these false certifications on behalf of Defendant.

In no way are Defendant's False Claims Act education materials factually or legally compliant with the clearly expressed requirements of Section 6032 of the Deficit Reduction Act or the Attestation of Compliance with that Act that Defendant signed "as a condition of receiving payments exceeding $5 million per federal fiscal year".

The profound difference between what Defendant's materials provide and what Defendant is attesting to Medicaid and CMS each year is in no way simply a "reasonable" difference in interpretation of a statute as Defendant contends. It is, instead, a blatant and knowing misstatement to Medicaid and CMS of what Defendant's education materials, handbooks and code of conduct actually contain. Defendant's knowingly false Attestation of Compliance with Section 6032 of the Deficit Reduction Act is at best sticking its head in the sand with

deliberate ignorance, and is at worst, acting with full and actual knowledge that what it was certifying to was not true. But, in either case, it constitutes a False Claims Act violation under 31 U.S.C. §3729(a)(1)(B).

And, with this factually and legally false attestation being recertified to and on file with Medicaid each year, Defendant was able to submit ongoing claims for Medicaid payments each federal fiscal year beyond the $5 million cap for non-compliant providers. Each such claim for payment constitutes a False Claims Act violation under 31 U.S.C. §3729(a)(1)(A).

### 2. Duffy has identified a conspiracy

Defendant uses the false argument that Relator has failed to identify a violation of the FCA to claim that Relator's claim of conspiracy must then necessary fail. Because Relator can establish False Claims Act violations in the present case, *U.S. ex rel. Conner v. Salina Regional Medical Health Center, Inc.*, 459 F.Supp. 2d 1081, 1091 (D. Kan. 2006) has no application here.

For example, internal emails of Defendant show Defendant's efforts, working in collaboration with senior management and Dr. Sabrina Prewett to shorten the "throughput" times on IQR. SOF¶¶137-140, 147. The emails show that Dr. Prewett suggested that they instead classify those patients as "complex patients" so that they wouldn't have to report "probably admit" times to CMS, which affected this timed quality measure more positively to CMS. This caused false reporting of throughput times on Defendant's IQR each quarter thereafter, and it caused Defendant's signed DACAs regarding those IQRs to also be false.

And the annual payment update/market basket update that Defendant received for its accurate and complete reporting of these throughput times were False Claims Act violations as well.

### 3.  Duffy has identified "reverse false claims".

31 U.S.C. §3729(a)(1)(G) makes it a false claims act violation to "knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government." This is sometimes referred to as a reverse false claim because it is money wrongly retained from the Government rather than money wrongly sought from the Government.

As set forth in Relator's Second Amended Complaint (Doc. 18), Medicare funded hospitals are paid for their OQR under a pay-for-reporting program that allows the reporting hospital to retain 2% of its market basket update/annual payment update that it otherwise owes back to the government if it fails to provide accurate and complete reporting on each of the OQR's tracked measures. One of these tracked measures is specifically "OP-5, Median-time-to-ECG," which tracks the median time from hospital arrival to the time of ECG for each reported patient who received an ECG during that quarter.[13]

---

[13]   Other tracked measures on the OQR have included "OP-1 Median time to Fibrinolyis," "OP-2 Fibrinolytic Therapy Received within 30 minutes of hospital arrival," "OP-16 Troponin Results for Emergency Department chest pain patients with probable Cardiac Chest Pain) within 60 minutes of hospital arrival," "OP-18 Median Time from ED Arrival to ED Departure

Defendant then certifies on each annual Data Accuracy and Completeness Acknowledgement ("DACA") form that the OQRs for each of the prior year's quarters were accurate and complete. This qualifies Defendant to retain the 2% of its Market Basket Update/Annual Payment Update it would otherwise owe back to the government. But because these DACA reports were false, and so was the accuracy and completeness to which the DACAs certified regarding those OQRs, Defendant was ineligible for any pay-for-reporting payments in that year. Defendant then not only owes civil fines for each of the false DACAs and false OQRs that were filed in order to secure payment under CMS's pay-for-reporting program, but also civil fines for each of the resulting claims for reimbursement for any procedures or services that were billed to Medicare with the falsely inflated "annual payment update" rate for reimbursement, plus treble the damages of any amount Defendant retained as payment it was not eligible to receive for that false reporting under the OQR pay-for-reporting program established by the Deficit Reduction Act of 2005.

The cases Defendant cites actually support Relator's claim. The facts of this case do not involve government sanctions. They involve overpayments the government made by allowing Defendant to retain 2% of its market basket update/annual payment update it was not actually eligible to receive or retain in any of the years since this scheme began in October 2010. There is a specific legal obligation for the Defendant to pay that amount, after trebling, to the

for Discharged ED Patients," and "OP-20: Door [hospital arrival time] to [time of] Diagnostic Evaluation by a Qualified Medical Professional."

Government. And Defendant has wrongly retained those funds.

## VI.   <u>CONCLUSION</u>

Defendant's Motion for Summary Judgment is premised on inaccurate statements of fact and law and upon genuine issues of material fact, and is premature.  Defendant's Motion for Summary Judgment was filed more than six months before the scheduled close of discovery during which it is anticipated that Relator will be able to secure remaining deposition testimony as well as necessary documents and records that Relator does not yet possess and that are the subject of on-going discovery disputes. Defendant's premature Motion for Summary Judgment appears to be an effort to avoid having to turn over the requested and necessary records Relator seeks in discovery, and which Defendant itself acknowledges are pertinent to this case.

WHEREFORE, for the foregoing reasons, Relator respectfully requests that Defendant's Motion for Summary Judgment (Doc 151) be denied in its entirety, and such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Theodore J. Lickteig
Theodore J. Lickteig #12977
Law Office of Theodore J. Lickteig
Greystone Office Plaza
127680 W. 87th Street, Suite 112
Lenexa, Kansas  66215
913-894-1090
tjllawoffice@planetkc.com

/s/ Sarah A. Brown
Sarah A. Brown # 12130
Daniel G. Curry # 22750
Brown and Curry, LLC
406 W. 34th Street, Suite 810
Kansas City, Missouri 64111
816-756-5458
sarah@brownandcurry.com
dan@brownandcurry.com

/s/ Robert K. Collins
Robert K. Collins #22675
Collins Law Office, LLC
P.O. Box 4786
Olathe, Kansas  66063
913-538-7472
robert@collinslegal.com

/s/ Anthony E . LaCroix
Anthony E. LaCroix # 24279
LaCroix Law Firm, LLC
406 W. 34th Street, Suite 810
Kansas City, Missouri 64111
816-339-4380
tony@lacroixlawkc.com

Attorneys for Plaintiff-Relator

<u>CERTIFICATE OF SERVICE</u>

I, Anthony E. LaCroix, hereby certify that on the 28th day of April, 2017, I filed the above and foregoing using the Court's CM/ECF system which will send notice of the filing to:

Robin Anderson
Robin.Anderson@usdoj.gov.
Assistant United States Attorney
Jon Fleenor
Jon.fleenor@usdoj.gov
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas 66101

*Attorneys for the United States*
*of America*

Andrew R. Ramirez
Lathrop & Gage LLP
10851 Mastin Boulevard
Building 82, Suite 1000
Overland Park, Kansas 66210-1669
aramirez@lathropgage.com

Jean Paul Bradshaw
David R. Frye
Elizabeth D. Hatting
Lathrop & Gage LLP
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
jbradshaw@lathropgage.com
dfrye@lathropgage.com
ehatting@lathropgage.com

*Attorneys for Defendant Lawrence*
*Memorial Hospital*

<u>*/s/ Anthony E. LaCroix*</u>
*Attorney for Relator*