IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,
ex rel. Megen Duffy,

                 Relator-Plaintiff,

vs.                           Case No. 14-2256-SAC-TJJ

LAWRENCE MEMORIAL HOSPITAL,

                 Defendant.

## MEMORANDUM AND ORDER

Megen Duffy has filed this qui tam action alleging the violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729(a)(1). Duffy asserts that defendant Lawrence Memorial Hospital ("LMH"): knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval to the Centers for Medicare & Medicaid Services ("CMS"); or made a material false statement in connection with a claim for payment; or made a material false statement in connection with a sum of money owed to the Government, or concealed or improperly avoided an obligation to pay or transmit money to the Government.

This case is now before the court upon LMH's motion for summary judgment. Doc. No. 151. The court has reviewed the

1

parties' briefs and exhibits.[1]  For the reasons which follow, the court shall deny the summary judgment motion.

I. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a).  A "genuine dispute as to a material fact" is one "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.  At the summary judgment stage, the court's job "is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . If [however] the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." Id. at 249-50.

II. DUFFY'S CLAIMS

The second amended complaint (Doc. No. 18) is the operative document for delineating Duffy's claims.  In "Count I" Duffy alleges multiple violations of the FCA.  Many of the alleged violations involve the value-based purchasing system for reimbursing care given to Medicare and Medicaid patients.  Under

---

[1] The court shall grant LMH's unopposed motion for leave to file excess pages. Doc. 198.

this system, care-providers may qualify for payments from the Government for submitting accurate and complete information to CMS and may qualify for incentive payments if the reported data shows that they are achieving certain treatment goals associated with better medical outcomes. Duffy claims that LMH submitted false data which affected various measures of inpatient and outpatient care used to calculate incentive payments. Doc. No. 18, ¶¶ 161-163, 166-168, 172-174. The bulk of the argumentation presented with LMH's summary judgment motion involves data reporting chest pain patients' "arrival time" in the emergency room. For example, a large part of the summary judgment motion concerns Duffy's claim that LMH did not properly measure the time elapsed between a chest pain patient's "arrival" at the emergency room and the administration of an EKG.

Duffy also alleges that LMH made a false claim or made or used a false record certifying compliance with Section 6032 of the Deficit Reduction Act, 42 U.S.C. § 1396a(68). This section requires that entities receiving annual payments of at least $5,000,000 from a Medicaid program shall as a condition of receiving such payments establish written policies for all employees to be provided detailed information about the FCA, administrative remedies for false claims, state laws pertaining to false claims, and whistleblower protections under such laws. Id. at ¶ 160.

Finally, Duffy claims that LMH violated the provisions of the FCA which prohibit using a false record or statement to conceal or improperly avoid an obligation to return an overpayment of money to the Government. Id. at ¶¶ 164-65, 169-70. This is a so-called "reverse false claim" under § 3729(a)(1)(G).

III. UNCONTROVERTED FACTS

The following facts are considered uncontroverted solely for the purposes of this summary judgment motion or, if in dispute, are viewed in a light most favorable to the nonmoving party. Some additional facts may be incorporated in the court's discussion of the legal issues in the section V of this order.

LMH participates in and receives money from the Medicare and Medicaid programs. As a participant, LMH reports information regarding patient care to CMS for its Inpatient Quality Reporting ("IQR") and Outpatient Quality Reporting ("OQR") programs. On a quarterly basis, LMH's Quality Services Department manually abstracts data from patient charts to report it to CMS. CMS has "Specifications Manuals" for the IQR and OQR programs which define and describe the data which LMH must submit. According to the manuals, all documentation in the medical record must be timed, dated and authenticated. The "General Abstraction Guidelines" provided by CMS state that when abstracting data from medical records, "[t]he medical record

must be abstracted as documented, (i.e., taken at 'face value')." If an event is not documented in the medical record, it is not abstracted and reported.

By successfully and accurately making such reports, LMH avoids penalties in the form of reduced payments for services to Medicare beneficiaries. Also, since fiscal year 2013, LMH's performance on some defined quality reporting measures has impacted CMS payments to LMH under the Hospital Value Based Purchasing ("HVBP") program. This program provides incentive payments to hospitals based upon the hospital meeting or not meeting certain HVBP metrics.

Some of the measures reported by LMH rely on the determination of a patient's "arrival time." CMS defines "arrival time" in the Specifications Manuals as: "The earliest documented time (military time) the patient arrived" at the hospital.

When a patient arrives at the LMH Emergency Department, a triage tech or nurse greets the patient and gets information from the patient, including the nature of the medical issue. An "interim form" is used at the Emergency Department entrance to record such things as chief complaint, time, doctor, allergies and medications. LMH discards the interim form after use. LMH also uses "triage sheets" to record information as patients enter the Emergency Department. The sheets record basic

information, such as vital signs, for example, that can be converted with more detail into a triage note. The sheets are discarded after information is transferred to an electronic triage note. A triage note is an electronic nursing document which contains more detail regarding a patient. LMH has instructed Emergency Department staff to write down the EKG time on triage sheets and to match the EKG time to the "triage time" on the triage note.

Hospital admissions workers have written down patient information on "face sheets" for later computer entry. LMH shreds the face sheets after use. Sometimes "cheat sheets" have been used to record patient information that was not on the face sheets.

CMS Specifications Manuals provide that emergency department records and outpatient records be examined to determine "arrival time." LMH is advised by the manuals to look at the earliest Emergency Department document in a patient's medical record to determine the patient's arrival time. "Emergency Department documentation" is broadly defined to include: vital sign records, registration forms, triage records, EKG reports, face sheets, consent for treatment forms, etc.

Starting in September 2010, LMH Emergency Department Educator or Clinical Coordinator Elaine Swisher, and then-Emergency Department Director Joan Harvey, sent a series of

written communications to Emergency Department staff which conveyed a priority that EKGs be given to chest pain patients in the Emergency Department before the patients were registered. Some of the communications indicated that this was important to maximize LMH's reimbursement from the government and that the goal was to have the EKG within three minutes of the patient's entry.[2] The registration process for an Emergency Department patient is called "QTR." A time stamp is generated when the QTR process is completed by the Emergency Department.

The following are three examples of the communications:

Make sure those patients who present to triage with chest pain come STRAIGHT BACK TO A ROOM – NO VS IN triage – StraightBack, Jack!! Quick registration can be done at bedside!! Bare the chest FIRST – get those patches on and get the EKG done, THEN finish undressing the pt, put on O2, put on monitor, get VS, etc. Door to EKG is 3, count 'em 3 minutes!!! We can do this, but it will require a change in current practice.

Yes, we are looking at other creative ways to expedite our processes to meet the "3 minute goal." The key factor here will be when we complete the registration process, so when in doubt wait to register until that 12 lead is completed.

In 2012 CMS (Medicare) will reimburse hospitals at a greater rate for those in the top 10% - - which is where the 3 minute time comes in. . . . Patients with an acute onset of chest pain or associated symptoms should have EKG done prior to QTR. Triage techs should not be told "go ahead and register, I will be right there."

---

[2] It is undisputed by the parties that a patient suffering a cardiac event should have an EKG as quickly as possible.

Crystal Rocha declared in an affidavit that she was employed as a registration clerk at LMH from approximately May 2012 to May 2013.[3] She stated that triage techs would enter information for Emergency Department patients (name, birth date, reason for visit, etc.) into the LMH computer system and that this was done prior to an EKG, unless the patient was unconscious. She further stated that if chest pain patients were registered prior to an EKG, LMH nurses would change the patient's record to show the EKG was done within a few minutes of the registration or was done at exactly the same time as the EKG. She testified that she was trained that cardiac patients should not be registered before the EKG in order for LMH to receive Medicare reimbursements.

Duffy has testified that LMH changed triage times to match EKG times. Jeanine McCullough-Baze, an emergency room nurse for LMH, testified that LMH wanted EKG time to be the triage time even if triage occurred before the EKG, in order to "pad the statistics" to increase reimbursement. When she questioned this practice, she was told by Swisher that there were other

---

[3] In LMH's reply brief, LMH asks that Rocha's affidavit be stricken because Duffy has not identified Rocha as an individual having information about this lawsuit as required by FED.R.CIV.P. 26(a)(1)(A). Plaintiff has not asked to make a surreply and has not otherwise responded to the request to strike. The court has broad discretion in evaluating Rule 26 violations. Woodworker's Supply Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999). Here, the court does not believe Rocha's affidavit is pivotal in the decision upon LMH's motion for summary judgment. Therefore, the court shall not grant LMH's request to strike the affidavit. But this action is without prejudice to LMH filing a motion for other sanctions.

hospitals where she could work.  Christina Neibarger has stated that when she worked as an admissions clerk, she was not allowed to admit a chest pain patient into the hospital's computer system until after the EKG was finished and that she was told that this was done to satisfy goals for Medicare reimbursement.

LMH does not dispute that its policy was to perform EKGs prior to completing the QTR process and that its staff conveyed that this policy would ensure higher Medicare reimbursement. For the second quarter of 2010, LMH reported a median arrival-to-EKG time of 9.3 minutes.  For at least eleven quarters beginning in the first quarter of 2011, LMH reported to CMS a median arrival-to-EKG time of zero minutes.

In 2015 and 2016, LMH submitted Attestations of Compliance with Section 6032 of the Deficit Reduction Act of 2005 (DRA) for the previous fiscal years.  The attestations state:

> I hereby attest that, as a condition for receiving payments exceeding $5 million per federal fiscal year, I have read Section 6032 of the Deficit Reduction Act of 2005 (the Act), and have examined the above-named provider / entity's policies and procedures. Furthermore, the provider / entity will continue to comply with these provisions to remain eligible for payment under the Kansas Medical Assistance Program.
>
> Based on that review, the provider / entity is in compliance with the requirements of the Act to educate employees and contractors concerning:
> • The Federal False Claims Act established under sections 3729 through 3733 of Title 31, United States Code

- Administrative remedies for false claims and statements established under Chapter 38 of Title 31, United States Code
- State laws pertaining to Medicaid fraud, abuse
- Civil or criminal penalties for false claims and statements
- Whistleblower protections under such laws, with respect to the role of such laws in preventing and detecting fraud, waste, and abuse in Federal health care programs

Section 6032 of the DRA provides in part:

> that any entity that receives or makes annual payments under the State plan of at least $5,000,000, as a condition of receiving such payments, shall--
> (A) establish written policies for all employees of the entity (including management), and of any contractor or agent of the entity, that provide detailed information about the False Claims Act established under sections 3729 through 3733 of Title 31, administrative remedies for false claims and statements established under chapter 38 of Title 31, any State laws pertaining to civil or criminal penalties for false claims and statements, and whistleblower protections under such laws, with respect to the role of such laws in preventing and detecting fraud, waste, and abuse in Federal health care programs (as defined in section 1320a-7b(f) of this title);
> (B) include as part of such written policies, detailed provisions regarding the entity's policies and procedures for detecting and preventing fraud, waste, and abuse; and
> (C) include in any employee handbook for the entity, a specific discussion of the laws described in subparagraph (A), the rights of employees to be protected as whistleblowers, and the entity's policies and procedures for detecting and preventing fraud, waste, and abuse;

42 U.S.C. § 1396a(68).

In 2007 and 2009, the LMH Code of Conduct stated that LMH is required to comply with laws that help prevent fraud and

abuse.   Prohibited activities include "[i]ntentionally or knowingly making false or fraudulent claims for payment or approval" and "[s]ubmitting false information for the purpose of gaining or retaining the right to participate in a plan or obtain reimbursement for services," among other things.   The Code of Conduct stated that if an employee believes that someone is conducting business in an illegal or unethical way, the employee should contact a supervisor, corporate compliance officer, or compliance hotline.   The Code stated that no one who reported fraud would be retaliated against as long as the information being reported was truthful to the best of the person's knowledge.

IV. FCA STANDARDS

The FCA, 31 U.S.C. § 3729(a)(1), imposes liability against any person who: (A) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; B) knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."   The FCA also makes liable those persons who

conspire to commit the above-described acts. 31 U.S.C. § 3729(a)(1)(C).

To prove a false claim under subsections (A) or (B), a relator must show that defendant: (1) made a claim; (2) to the government; (3) that is materially false or fraudulent; (4) knowing of its falsity; and (5) seeking payment from the federal government. See U.S. v. The Boeing Company, 825 F.3d 1138, 1148 (10th Cir. 2016).

To prove a "reverse false claim" under FCA section 3729(a)(1)(G) a relator must show that: (1) the defendant knowingly made a materially false record or statement; (2) to improperly avoid or decrease an obligation to pay or transmit money or property to the government. See U.S. ex rel. Matheny v. Medco Health Solutions, Inc., 671 F.3d 1217, 1222 (11th Cir. 2012).

False claims under the FCA may be either factually false or legally false. Boeing, 825 F.3d at 1148; U.S. ex rel. Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1168 (10th Cir. 2010). A factually false claim involves the submission of an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided. Boeing, 825 F.3d at 1148; Lemmon, 614 F.3d at 1168 (interior quotation omitted). A legally false claim is one which falsely certifies compliance with a regulation or contractual provision as a

condition of payment. <u>Boeing</u>, 825 F.3d at 1148; <u>Lemmon</u>, 614 F.3d at 1168. A legally false claim may be express or implied. <u>Boeing</u>, 825 F.3d at 1148. An express claim occurs upon a false certification of compliance with a term where compliance is a prerequisite to payment. <u>Id.</u> An implied claim occurs when the request for payment lacks an express certification, but contains a knowing and false implication of entitlement to payment. <u>Id.</u> "[T]he implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." <u>Universal Health Services, Inc. v. United States ex rel. Escobar</u>, 136 S.Ct. 1989, 2001 (2016). "A statement that misleadingly omits critical facts is a misrepresentation irrespective of whether the other party has expressly signaled the importance of the qualifying information." <u>Id.</u> "[H]alf-truths -— representations that state the truth only so far as it goes, while omitting critical qualifying information —— can be actionable misrepresentations." <u>Id.</u> at 2000. "Instead of adopting a circumscribed view of what it means for a claim to be false or fraudulent, concerns about fair notice and open-ended liability

can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements. Those requirements are rigorous." Id. at 2002 (interior quotations and citation omitted).

V. LMH'S ARGUMENTS FOR SUMMARY JUDGMENT

    A. No false claim

LMH's first argument for summary judgment contends that Duffy cannot prove that LMH submitted an objectively false claim for payment or used a false record to do so.[4] This argument relates to the main, but not the only, area of dispute -- that is the data LMH submitted to CMS regarding the "arrival time" of chest pain patients. According to LMH, it has submitted its data in accordance with the CMS Specifications Manuals which allow listing the EKG time as the arrival time if the EKG time was the earliest date and time in the record. Duffy does not deny that if "the EKG time is the earliest time in the patient's Emergency Department record, after all of the other events in that record having a recorded time have been authenticated, then the hospital . . . is allowed to report the EKG time as the time of that patient's arrival." Doc. No. 178, p. 48. But, Duffy

---

[4] This argument concentrates on whether Duffy can prove a false claim. In the reply brief, LMH suggests that Duffy has no evidence of payment from the Government. Doc. No. 199, p. 60. The court rejects this somewhat new argument because LMH has failed to prove that there was no payment in connection with the alleged false claims and LMH has failed to show that Duffy cannot supply proof of payment. In other words, this remains a material issue of fact upon the record provided to the court.

asserts that "if times or events that are required to be recorded in the patient record are omitted, falsified or destroyed to make the EKG time appear to be the first event in the patient record, then that patient record is false" and in violation of CMS requirements that documentation be timed and authenticated. Id. at 48-49. LMH responds: "It is common sense that LMH could not violate the FCA by failing to document information which they are not required to document." Doc. No. 199, p. 58 (emphasis added). Indeed, LMH contends that Duffy has no evidence that LMH is required to document in a patient's record the forms or cheat sheets or face sheets which Duffy alleges were omitted or destroyed by LMH.[5]

---

[5] LMH notes that federal regulations cited by Duffy (42 C.F.R. § 482.24(c)) require that LMH maintain a medical record which contains: "information to justify admission and continued hospitalization, support the diagnosis, and describe the patient's progress and response to medications and services.
(1) All patient medical record entries must be legible, complete, dated, timed, and authenticated in written or electronic form by the person responsible for providing or evaluating the service provided, consistent with hospital policies and procedures.
(2) All orders, including verbal orders, must be dated, timed, and authenticated promptly by the ordering practitioner or by another practitioner who is responsible for the care of the patient only if such a practitioner is acting in accordance with State law, including scope-of-practice laws, hospital policies, and medical staff bylaws, rules, and regulations.
(3) Hospitals may use pre-printed and electronic standing orders, order sets, and protocols for patient orders only if the hospital:
(i) Establishes that such orders and protocols have been reviewed and approved by the medical staff and the hospital's nursing and pharmacy leadership;
(ii) Demonstrates that such orders and protocols are consistent with nationally recognized and evidence-based guidelines;
(iii) Ensures that the periodic and regular review of such orders and protocols is conducted by the medical staff and the hospital's nursing and pharmacy leadership to determine the continuing usefulness and safety of the orders and protocols; and
(iv) Ensures that such orders and protocols are dated, timed, and authenticated promptly in the patient's medical record by the ordering

15

Reading the record in a light most favorable to Duffy, it appears that CMS intends the earliest Emergency Department document be used to determine a patient's arrival time. E.g., Doc. No. 152-7 pp. 1 and 5 (excerpts from Specifications Manuals for Hospital Outpatient Department Quality Measures). Further, it appears that those documents may include, for example, face sheets. See e.g., Doc. No. 152-6, pp. 24 and 36 (IQR Specifications Manual provisions which direct using an Emergency Department face sheet to document arrival time if it is the earliest time); Doc. No. 152-7, pp. 15 and 39 (OQR

practitioner or by another practitioner responsible for the care of the patient only if such a practitioner is acting in accordance with State law, including scope-of-practice laws, hospital policies, and medical staff bylaws, rules, and regulations.
(4) All records must document the following, as appropriate:
(i) Evidence of—
(A) A medical history and physical examination completed and documented no more than 30 days before or 24 hours after admission or registration, but prior to surgery or a procedure requiring anesthesia services. The medical history and physical examination must be placed in the patient's medical record within 24 hours after admission or registration, but prior to surgery or a procedure requiring anesthesia services.
(B) An updated examination of the patient, including any changes in the patient's condition, when the medical history and physical examination are completed within 30 days before admission or registration. Documentation of the updated examination must be placed in the patient's medical record within 24 hours after admission or registration, but prior to surgery or a procedure requiring anesthesia services.
(ii) Admitting diagnosis.
(iii) Results of all consultative evaluations of the patient and appropriate findings by clinical and other staff involved in the care of the patient.
(iv) Documentation of complications, hospital acquired infections, and unfavorable reactions to drugs and anesthesia.
(v) Properly executed informed consent forms for procedures and treatments specified by the medical staff, or by Federal or State law if applicable, to require written patient consent.
(vi) All practitioners' orders, nursing notes, reports of treatment, medication records, radiology, and laboratory reports, and vital signs and other information necessary to monitor the patient's condition.
(vii) Discharge summary with outcome of hospitalization, disposition of case, and provisions for follow-up care.
(viii) Final diagnosis with completion of medical records within 30 days following discharge."

16

Specifications Manual indicating the intent is to use any documentation which reflects processes that occurred in the Emergency Department and making reference to Emergency Department face sheet). If, as some evidence indicates, Emergency Department documents or record entries were knowingly destroyed or altered or disregarded to create a false implication as to the earliest documented time of arrival, then a material issue of fact exists as whether a false record was used to support a false claim for payment.[6]

LMH contends that the Specifications Manuals and pertinent regulations permit LMH to destroy, alter or disregard Emergency Department documents to substantiate a different "arrival time" than would otherwise be the case, as long as such a course is consistent with hospital policies and procedures. On the basis of the record and arguments as they now stand, the court does not accept this argument. The court acknowledges that the Specifications Manuals make reference to 42 C.F.R. 482.24(c)(1) which requires that "medical record entries must be legible, complete, dated, timed, and authenticated in written or electronic form by the person responsible for providing or evaluating the service provided, consistent with hospital

---

[6] LMH's rather general claim that CMS has audited LMH's reporting three times since 2010 and found that the threshold for accuracy in reporting was satisfied is not sufficient to eliminate a question of fact as to accuracy, given the evidence presented by Duffy and recounted in section III of this opinion.

policies and procedures." But, there is nothing in the Specifications Manuals which suggests that a quality measure involving "arrival time" should be falsely reported or falsely implied even if it is technically consistent with hospital record keeping policies. Rather, the references to § 482.24(c)(1) indicate that it is a resource to consider regarding documents dated after the end of the date of service and for questions concerning the authentication of medical records. See, e.g., Doc. No. 152-10, p. 19.

Next, LMH contends that its interpretation of the regulations is "objectively reasonable" and therefore it did not make a false claim or, at least, knowingly make a false claim. The "arrival time" is based upon the earliest Emergency Department document in a patient's record. The "earliest Emergency Department document" is a seemingly simple concept and less ambiguous than the topics discussed in the cases cited by LMH to support its argument.[7] There is evidence in the record

_____

[7] LMH cites numerous cases a pp. 25-30 of Doc. No. 152. These cases include U.S. ex rel. Donegan v. Anethesia Associates of Kansas City, 833 F.3d 874 (8th Cir. 2016)(regarding the term "emergence" as used in regulations governing anesthesiologists). LHM also cites U.S. ex rel. Burlbaw v. Orenduff, 548 F.3d 931, 959 (10th Cir. 2008) which relies upon U.S. ex rel. Morton v. A Plus Benefits, Inc., 139 Fed.Appx. 980, 983-84 (10th Cir. 2005) for the proposition that the FCA requires proof of an objective falsehood. In Orenduff, the court found an allegedly false letter was unambiguously true. In Morton, the court found the terms "therapeutic care" and "custodial care" ambiguous in a factual context involving the care of a premature infant. LMH also cites U.S. ex rel. Polukoff v. St. Mark's Hospital, 2017 WL 237615 (D.Utah 1/19/2017) which involved the apparently debatable issue of when a PFO closure (a heart procedure) was medically necessary and U.S. ex rel. Hixon v. Health Management Systems, Inc., 613 F.3d 1186 (8th Cir. 2010) which concerns

18

that Emergency Department documents were destroyed, altered or disregarded to affect the time of the earliest Emergency Department document in a patient's record. This evidence creates a material issue of fact as to whether LMH's actions promulgated a knowingly false claim.[8]

B. Materiality

LMH contends that summary judgment is warranted because Duffy cannot prove that the alleged falsehood communicated by LMH was material to receiving payment from the Government. "Material" is defined in the FCA as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). There is evidence in the record, for instance, that pursuant to the HVBP system "arrival time" data had an influence upon the amount of government payments LMH received. While there also may be evidence that CMS made incentive payments to LMH in spite of a

an issue of statutory interpretation where there was no authoritative interpretation contrary to that relied upon by the defendant.

[8] At p. 37 of Doc. No. 152, LMH argues that Duffy cannot identify any abstractors who submitted arrival time data to CMS much less that they knowingly submitted fraudulent data. LMH does not expand upon this argument to persuade the court that such information is required to create a material issue of fact as to whether false data was knowingly employed to support a claim for payment from the Government. LMH further states at p. 38 that Duffy cannot identify any specific false claim for reimbursement and that she relies on "generalities" in her Second Amended Complaint. The "general" process of data reporting and value-based purchasing is not disputed by LMH and the court believes this process, together with the other evidence in the record, creates a material issue of fact as to whether claims for payment were made upon the basis of knowingly false information. Nor does the case cited by LMH, U.S. ex rel. Grandeau v. Cancer Treatment Centers of America, 2003 WL 21504998 (N.D.Ill.6/30/2003), provide convincing support that Duffy lacked sufficient knowledge to proceed with a FCA claim where Duffy provides an outline of a fraudulent scheme and gives examples of alleged misconduct.

report of Duffy's allegations, there is some vagueness relating to the details of the report, who with CMS received it, and how CMS reacted. The court concludes that the strength of the evidence submitted by LMH is subject to some reasonable dispute and, upon the current record, it is insufficient to extinguish an issue of fact. See U.S. ex rel. Scutellaro v. Capitol Supply, Inc., 2017 WL 1422364 *21 (D.D.C. 4/19/2017)("mixed signals" from GSA officials create issues of material fact as to materiality); U.S. ex rel. Brown v. Celgene Corp., 2016 WL 7626222 *12-13 (C.D.Cal. 12/28/2016)("[t]he fact that the government sometimes exercises its discretion to excuse non-compliance with a requirement does not establish that the requirement is immaterial as a matter of law"); see also, U.S. ex rel. Escobar v. Universal Health Servs., Inc., 842 F.3d 103, 109 (1st Cir. 2016)(the Supreme Court's Escobar decision, 136 S.Ct. 1989 (2016), makes clear that courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive"). In sum, the court concludes that upon the record now before it, a material issue of fact exists as to whether false data or omitted data which misrepresented "arrival times" was material to claims for money by LMH.

C.  Compliance with the Deficit Reduction Act (DRA)

LMH's next argument concerns Duffy's claim that LMH falsely certified compliance with the requirement in the DRA, 42 U.S.C. § 1396a(68), that LMH, among other things, provide detailed information about the False Claims Act to its employees. According to LMH, Duffy and other LMH employees received copies of the Code of Conduct which committed LMH to compliance with anti-fraud statutes and prohibited making false or fraudulent claims for payment or approval, or submitting false information to obtain reimbursement of services.  Further, the Code of Conduct stated that anyone reporting fraud will not be retaliated against.  But, LMH appears to admit that it has not provided information which refers to the FCA "by name or what it is and what it does, its definitions of what constitutes a false claim, how to report violations, how to file [FCA] lawsuits, or financial incentives created by Congress to encourage such lawsuits."  Doc. No. 199, p. 94.  Upon review of the record before the court, a reasonable person could conclude that LMH plainly has not provided the detailed FCA information required by the DRA, contrary to LMH's attestations.[9]  Therefore, the

---

[9] The court's review of the record includes review of the employee handbooks which Duffy submitted as exhibits and which LMH mentions in its reply brief.

court rejects LMH's argument for summary judgment on this claim.[10]

D. Conspiracy

In LMH's initial brief in support of its motion for summary judgment, LMH makes the mostly legal argument that Duffy's conspiracy claim under § 3729(a)(1)(C) should be dismissed pursuant to the intracorporate conspiracy doctrine. Most courts that have considered the matter hold that the intracorporate conspiracy doctrine applies to FCA actions so that a corporation cannot be charged with conspiring with its employees to violate the act. E.g., U.S. ex rel. Hagerty v. Cyberonics, Inc., 95 F.Supp.3d 240, 269-70 (D.Mass. 2015)(citing cases from many jurisdictions); U.S. ex rel. Chilcott v. KBR, Inc., 2013 WL 5781660 *10-11 (C.D.Ill. 10/25/2013)(reviewing cases from several courts); U.S. ex rel. Ruhe v. Masimo Corp., 929 F.Supp.2d 1033, 1037-38 (C.D.Cal. 2012).

In response, Duffy asserts that internal emails show that LMH worked "in collaboration" with a non-employee physician to engage in false reporting of "throughput" times which measure the time from the decision to admit a patient to the hospital to the time the patient departs the Emergency Department. Thus,

---

[10] In footnote 20 in the reply brief, Doc. No. 199, p. 92, LMH argues that Duffy lacks the "direct and independent knowledge" of LMH's alleged noncompliance with the DRA after 2013 necessary for the court to have jurisdiction over such a claim. This argument is raised for the first time in the reply brief and the court shall not address it here. See Lynn v. General Elec. Co., 2006 WL 14564 *1 (D.Kan. 1/3/2006).

Duffy does not make a legal argument against the application of the intracorporate conspiracy doctrine, but asserts that there is evidence of a conspiracy involving LMH and non-employees.

In reply, LMH makes the mostly factual argument that this evidence regarding "throughput" times and terminology is not sufficient to reasonably support a FCA violation. LMH's argument in reply falls within LMH's overarching contention upon summary judgment that there is insufficient evidence of a FCA violation and it relates to the argument made by Duffy in her response to the summary judgment motion. Nevertheless, although this is a gray area, the court believes it is fair to categorize the argument as a new contention against the conspiracy claim.

As suggested in footnote 10, the court in general eschews the consideration of new arguments in reply briefs. Therefore, the court will not consider LMH's argument in reply here. See OMB Police Supply, Inc. v. Elbeco, Inc., 2001 WL 681575 *3 (D.Kan. 5/11/2001)(declining to consider substantive antitrust arguments made first in reply brief where original brief only raised question of whether the plaintiff had properly identified a co-conspirator); Thurston v. Page, 931 F.Supp. 765, 768 (D.Kan. 1996)(declining to consider substantive argument first raised in a reply brief as to whether the plaintiff suffered an injury, when defendant raised a statute of limitations claim in the initial brief).

E. "Reverse false claim"

Finally, LMH argues that Duffy cannot prove a "reverse false claim" under § 3729(a)(1)(G) because Duffy has not identified a sum of money that LMH owes the government which it has avoided paying. In response, Duffy contends that LMH was ineligible for any pay-for-reporting payments during years when it falsely certified the accuracy and completeness of the OQR data submitted to CMS. In reply, LMH asserts that Duffy does not cite case law to support her contention and does not contest the case law cited by LMH.

The current argumentation does not supply sufficient grounds to grant summary judgment against this claim. Section 3729(a)(1)(G) makes liable "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." The FCA was amended in 2009 under the Federal Enforcement Recovery Act to provide that an "obligation" includes "the retention of any overpayment." 31 U.S.C. § 3729(b)(3). This amendment post-dates the case law cited by LMH. It either changes or clarifies the statute to make the knowing retention of an overpayment sufficient to establish an obligation to pay money to the

Government.   See U.S. ex rel. Prather v. Brookdale Senior Living, 838 F.3d 750, 774 (6th Cir. 2016); see also U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Company, 839 F.3d 242, 255 (3rd Cir. 2016)(mere knowledge and avoidance of an obligation is sufficient to give rise to liability).   This statutory language appears consistent with Duffy's reverse false claim argument.   Therefore, the court finds that LMH has failed to demonstrate on the record before the court that Duffy cannot prove a reverse false claim.

VI. CONCLUSION

In conclusion, the court shall grant the unopposed motion for leave to file excess pages (Doc. No. 198) and, for the above-stated reasons, the court shall deny LMH's motion for summary judgment.   Doc. No. 151.

**IT IS SO ORDERED.**

Dated this 7th day of July, 2017, at Topeka, Kansas.

s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge